THIS COLLATERALIZED DISCOUNT BOND AND PAR BOND
EXCHANGE AGREEMENT (this "<u>Agreement</u>") dated as of December 6,
1992 among:

(i)  THE REPUBLIC OF ARGENTINA ("<u>Argentina</u>"), on its
own behalf and on behalf of each other Argentine obligor
(each an "<u>Obligor</u>") party to a Debt Agreement,

(ii)  the Recognized Holders of Eligible Debt
executing and delivering this Agreement, as identified on
Annex I (the "<u>Purchasers</u>"),

(iii)  the agents under the Debt Agreements executing
and delivering this Agreement, as identified on Annex II
(such banks in such capacity being the "<u>Debt Agreement
Agents</u>"),

(iv)  Morgan Guaranty Trust Company of New York, as
the agent for Argentina for the reconciliation of the
Promissory Notes (such bank in such capacity being the
"<u>Promissory Note Agent</u>"), and

(v)  Citibank, N.A., as closing agent hereunder
(such bank in such capacity and any successor closing
agent hereunder being the "<u>Closing Agent</u>").

## W I T N E S S E T H :

WHEREAS, the parties make the following recitals
(terms being used in these recitals as such terms are defined
in Article I hereof):

(A)  By a communication dated June 23, 1992 and a
supplemental communication dated November 10, 1992; both from
the Minister of Economy and Public Works and Services,
Argentina has requested the international banking community
to participate in the 1992 Financing Plan.

(B)  The 1992 Financing Plan consists of the
following separate but interrelated Parts:

<u>Part I</u>:  Interest arrangements, which will be
implemented by the Floating Rate Bond
Exchange Agreement;

R-2

Part II:    Principal options, which will be
            implemented by this Agreement;

Part III:   Waivers and amendments to the Existing
            Agreements as requested by Argentina; and

Part IV:    Interim measures to be taken prior to the
            implementation of the 1992 Financing Plan.

The 1992 Financing Plan provides for a simultaneous
closing of the transactions contemplated in the 1992
Financing Plan.

(C) This Agreement implements Part II of the 1992
Financing Plan.

WHEREAS, the Purchasers are willing to purchase
Discount Bonds and Par Bonds on the terms and conditions set
forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and
the mutual covenants contained in this Agreement, the parties
hereto agree as follows:

# ARTICLE I

## DEFINITIONS

SECTION 1.01.  <u>Certain Defined Terms</u>.  As used in this Agreement (including the recitals above), except as otherwise expressly provided, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>Affiliate</u>" of any Person means (i) any other Person controlling, controlled by, or under common control with, such Person and (ii) in the case of any Person which is in liquidation, any shareholder of such Person which is a Purchaser under this Agreement.  For the purpose of this definition only, the term "<u>control</u>" (including the terms "<u>controlling</u>", "<u>controlled by</u>" and "<u>under common control with</u>") means, with respect to any Person, the possession, direct or indirect, of the power to vote 50% or more of the securities having ordinary voting power for the election of directors of such Person or to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

"<u>Affiliated Committing Group</u>" means, for purposes of Section 2.07 hereof, a group of Purchasers (each of which is an Affiliate of the other) which has executed and delivered to the Closing Agent a Certificate of Affiliated Committing Group.

"<u>Agreement</u>" has the meaning specified in the introductory paragraph hereof.

"<u>Agreement Currency</u>" has the meaning specified in Section 6.08(b) hereof.

"<u>Alianza Naviera GRA</u>" means the Guaranteed Refinancing Agreement dated as of November 1, 1987 among Alianza Naviera Argentina, S.A., as borrower, Argentina, BCRA, the banks parties thereto and The Bank of New York, as syndicate agent for such banks.

"<u>Alternate London Process Agent</u>" has the meaning specified in Section 6.07(b) hereof.

"<u>Alternate New York Process Agent</u>" has the meaning specified in Section 6.07(b) hereof.

2

"Alternate Process Agents" has the meaning specified in Section 6.07(b) hereof.

"Amendments" means the amendments to the Debt Agreements listed on Schedule F hereto.

"Applicable Taxes" has the meaning specified in Section 6.06(a).

"Argentina" has the meaning specified in the introductory paragraph hereof.

"Argentine Authorization" means any approval, authorization, permit, consent, exemption (including, without limitation, an exemption for stamp taxes applicable in the City of Buenos Aires in connection with the execution and delivery of this Agreement and the other Principal Bond Agreements) or license or any other action of or by, and notice to or filing or registration with, Argentina or any Argentine Governmental Agency or any other governmental authority or agency or regulatory body of Argentina or any subdivision thereof or therein.

"Argentine Bank" means (i) any bank or financial institution owned or controlled, directly or indirectly, by Argentina, including, without limitation, Banco de la Nación Argentina, Banco Nacional de Desarrollo, Banco de Inversión y Comercio Exterior, Banco Hipotecario Nacional and Caja Nacional de Ahorro y Seguro and any successors thereto and (ii) Banco de la Provincia de Buenos Aires and Banco de la Ciudad de Buenos Aires and any successors thereto. Notwithstanding the foregoing, a bank or financial institution shall not be deemed to be an Argentine Bank under clause (i) above by virtue of the administration of such bank or financial institution by Argentina (or any governmental body, ministry, agency, authority or self-administered entity (entidad autárquica) thereof) in connection with the receivership, insolvency, bankruptcy or liquidation of such bank or financial institution.

"Argentine Governmental Agency" means (i) any governmental body, ministry, agency, authority or self-administered entity (entidad autárquica) of Argentina, (ii) any corporation, bank, financial institution or other entity owned or controlled, directly or indirectly, by Argentina or any entity described in clause (i) above, and (iii) Banco de la Provincia de Buenos Aires and Banco de la Ciudad de Buenos Aires and

3

any successors thereto; <u>provided</u> that an entity regulated by BCRA or any other Argentine Governmental Agency shall not be deemed to be an "Argentine Governmental Agency" at any time during which, by virtue of such Argentine Governmental Agency's regulatory authority, such entity is administered by such Argentine Governmental Agency in connection with the receivership, insolvency, bankruptcy or liquidation of such entity.

"<u>Argentine Governmental Entity</u>" means (i) any Argentine Governmental Agency, (ii) any province, department or other political subdivision of Argentina, (iii) any governmental body, ministry, agency, authority, self-administered entity (<u>entidad autárquica</u>) or any province, department or political subdivision thereof, (iv) any corporation, bank, financial institution, or other entity owned or controlled directly or indirectly, by any entity described in clause (ii) or (iii) above, and (v) any binational entity (<u>entidad binacional</u>) or other corporation or other entity which under the organic law or charter of such binational entity, corporation or other entity or any existing law (including, without limitation, any treaty, rule, regulation, order, decree or judgment) is jointly sponsored and effectively controlled by Argentina (or any other entity described in clauses (i), (ii) and (iii) above) and any Other Country Sponsor (as defined in the 1987 GRA).

"<u>Argentine Person</u>" means any individual who is a citizen or resident of Argentina, a Person organized under the laws of Argentina or any political subdivision thereof or therein or having its principal place of business in Argentina or a Person controlled by any such Person.

"<u>Argentine Taxes</u>" has the meaning specified in Section 6.06(a) hereof.

"<u>Assignee</u>" has the meaning specified in Section 6.10(c) hereof.

"<u>AUSA GRA</u>" means the Guaranteed Refinancing Agreement dated as of August 1, 1987 among Autopistas Urbanas, S.A., as borrower, Argentina, as guarantor, BCRA, the banks party thereto and Midland Bank plc, as syndicate agent for such banks.

"<u>Authenticating Agent</u>" has the meaning specified in the USD Fiscal Agency Agreement.

4

"BCRA" means Banco Central de la República Argentina and any successor thereto.

"BCRA Undertaking" means the BCRA Undertaking, in substantially the form of Exhibit 5 hereto, from BCRA to the Fiscal Agent and the Closing Agent.

"Belgian Francs" or "BFF" means lawful currency of the Kingdom of Belgium of the type commonly referred to as "financial francs".

"BONEX" means (i) Bonos Externos de la República Argentina issued under Law No. 19,686 enacted by the Argentine Congress on June 15, 1972, (ii) any instrument issued by Argentina in exchange, or as a replacement for, the instrument referred to in clause (i) above and (iii) any instrument issued after the date hereof by Argentina which is similar to the instrument referred to in clause (i) above as to purpose, nature and characteristics, including being (a) payable in U.S. Dollars, (b) payable in financial centers around the world (i.e., New York, Zürich, London, etc.), (c) quoted in both Pesos and in U.S. Dollars and (d) issued in bearer form.

"Business Day" means a day on which (i) dealings are carried on in the London interbank market and (ii) banks are not required or authorized to close in New York City; provided that with respect to the Exchange Date and the Escrow Release Date, "Business Day" shall mean a day on which, in addition to (i) and (ii) above, banks are scheduled in the normal course to be open for business in Amsterdam, Brussels, Frankfurt am Main, Lisbon, London, Madrid, Milan, Paris, Tokyo, Toronto and Zürich and in the principal financial centers required to be open to permit dealings and settlements in European Currency Units in London, Paris, Brussels and Luxembourg and none of the United States Department of the Treasury, the Federal Reserve Bank of New York and the Escrow Agent is closed.

"Canadian Dollars" or "CAN" means lawful currency of Canada.

"Cash Payment" has the meaning specified in the Floating Rate Bond Exchange Agreement.

"Cedel" means Cedel S.A. and any successor thereto.

5

"<u>Certificate of Affiliated Committing Group</u>" means a certificate from a group of Purchasers (each of which is an Affiliate of the other), substantially in the form of Exhibit 7 hereto.

"<u>Closing Agent</u>" has the meaning specified in the introductory paragraph hereof.

"<u>Closing Book</u>" means the Closing Documents Book, dated as of the date hereof, containing the forms of closing documentation to be delivered in connection with the implementation of the 1992 Financing Plan.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Co-Financing Agreement</u>" means the 1987 Commercial Bank Parallel Co-Financing Loan Agreement dated as of August 1, 1987 among the Republic of Argentina, as borrower, BCRA, Citibank, N.A., as agent, and the banks party thereto, as amended as of March 1, 1988.

"<u>Collateral</u>" has the meaning specified in each Collateral Pledge Agreement.

"<u>Collateral Agent</u>" means the Federal Reserve Bank of New York and any successor thereto, as the Collateral Agent under the Collateral Pledge Agreements.

"<u>Collateral Pledge Agreement</u>" means each Collateral Pledge Agreement for the Principal Bonds, substantially in the form of Exhibit 3 hereto, made by Argentina in favor of the Collateral Agent and relating to all Series of Principal Bonds denominated in the same Principal Bond Currency, as amended and in effect from time to time.

"<u>Commitment Telex</u>" means the telex in substantially the form of Annex B to the 1992 Financing Plan.

"<u>Common Depositary</u>" means Union Bank of Switzerland, as common depositary for Cedel and the Euroclear Operator, acting through an office located outside the United States to be designated by it with the consent of Argentina.

"<u>Conditions</u>" means the provisions set forth under the "Conditions of Bonds" in the Principal Bonds denominated in Deutsche Mark.

6

"<u>Conversion Date</u>" has the meaning specified in Schedule B hereto.

"<u>Convertibility Law</u>" means Law No. 23,928 enacted by the Argentine Congress on March 27, 1991.

"<u>Debt Agreement Agents</u>" has the meaning specified in the introductory paragraph hereof.

"<u>Debt Agreements</u>" means the 1987 TCA, the 1985 TCA, the 1983 TCA, the Co-Financing Agreement, the 1987 GRA, the 1987 BNA Refinancing Agreement, the 1987 Provincia Refinancing Agreement, the Salto Grande GRA, the AUSA GRA, the Alianza Naviera GRA, the Promissory Notes and the Public Sector Onlending Agreements.

"<u>Designated Argentine Governmental Agency</u>" means any Argentine Governmental Agency the obligations of which are entitled under Argentine law to the full faith and credit of Argentina.

"<u>Deutsche Mark</u>" or "<u>DMK</u>" means lawful currency of the Federal Republic of Germany.

"<u>Discount Bond</u>" means each Discount Bond (a) of each Series (other than the DMK Discount Series) (including the U.S. Global Discount Bonds and the Non-U.S. Global Discount Bonds), substantially in the form of Exhibits 1 and 2A, and (b) of the DMK Discount Series Bonds (in permanent global form), the execution copy and the controlling version to be in the German language and to contain terms substantially the same as those set forth in the English translation of the DMK Bonds attached as Exhibit 2B hereto.

"<u>Discount Series L</u>" has the meaning specified in Section 1(a) of the USD Fiscal Agency Agreement.

"<u>DMK Bonds</u>" means the Principal Bonds of any Series denominated in Deutsche Mark.

"<u>DMK Discount Series</u>" has the meaning specified in the DMK Fiscal Agency Agreement.

"<u>DMK Equivalent</u>" means (i) of any amount of Eligible Debt denominated in an Original Currency other than Deutsche Mark, the Deutsche Mark equivalent amount calculated on the basis of the Translation Rate

7

applicable to such Original Currency and (ii) of any amount of Eligible Debt denominated in Deutsche Mark, a Deutsche Mark amount equal to such amount.

"DMK Fiscal Agency Agreement" means the DMK Discount Bond and Par Bond Fiscal Agency Agreement between Argentina and the Fiscal Agent thereunder, substantially in the form of Exhibit 4B hereto, as amended and in effect from time to time.

"DMK Global Bearer Bonds" has the meaning specified in Section 3.04 hereof.

"DMK Par Series" has the meaning specified in the DMK Fiscal Agency Agreement.

"Domestic Foreign Currency Indebtedness" means (a) the following Indebtedness: (i) Bonos del Tesoro issued under Decree No. 1527/91 and Decree No. 1730/91, (ii) Bonos de Consolidación issued under Law No. 23,982 and Decree No. 2140/91, (iii) Bonos de Consolidación de Deudas Previsionales issued under Law No. 23,982 and Decree No. 2140/91, (iv) Bonos de la Tesorería a 10 Años de Plazo issued under Decree No. 211/92 and Decree No. 526/92, (v) Bonos de la Tesorería a 5 Años de Plazo issued under Decree No. 211/92 and Decree No. 526/92 and (vi) Ferrobonos issued under Decree No. 52/92 and Decree No. 526/92; and (b) any other Indebtedness payable by its terms, or which at the option of the holder thereof may be payable, in a currency other than Pesos which is (i) offered exclusively within Argentina or (ii) issued in payment, exchange, substitution, discharge or replacement of Indebtedness payable in Pesos; provided that, in no event shall BONEX be deemed to constitute "Domestic Foreign Currency Indebtedness".

"Dutch Guilders" or "DGU" means lawful currency of the Netherlands.

"Eligible Debt" or "ED" means all principal amounts outstanding on the Exchange Date under the Debt Agreements; provided that any such indebtedness held by or on behalf of any Argentine Bank (other than indebtedness held by an Argentine Bank to the extent that such indebtedness is beneficially owned by a Person other than any Argentine Bank) shall constitute Eligible Debt to the extent that (a) the sum of all principal amounts outstanding under the Debt Agreements that are owed, directly or indirectly, to such Argentine Bank exceeds

8

(b) the sum of all principal amounts outstanding under the Debt Agreements that are owed by such Argentine Bank to any Person; <u>provided further</u> that the following indebtedness shall not constitute Eligible Debt: (i) indebtedness held by or on behalf of any Argentine Governmental Agency other than an Argentine Bank or (ii) indebtedness submitted to Argentina or an Argentine Governmental Agency in connection with a privatization, unless (x) such indebtedness is rejected or otherwise disqualified for such privatization and (y) the Closing Agent and the relevant Debt Agreement Agent are notified thereof by BCRA, in each case, at least 45 calendar days prior to the Exchange Date.

"Eligible Institutional Investor" means:

(i) any bank as defined in Section 3(a)(2) of the Securities Act, whether acting in its individual or fiduciary capacity; <u>or</u>

(ii) any insurance company as defined in Section 2(13) of the Securities Act; <u>or</u>

(iii) any investment company registered under the Investment Company Act of 1940 of the United States, as amended; <u>or</u>

(iv) any plan established and maintained by a state of the United States, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees if such plan has total assets in excess of U.S.$5 million; <u>or</u>

(v) any employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 of the United States, as amended, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, insurance company, or registered investment adviser or if the employee benefit plan has total assets in excess of U.S.$5 million; <u>or</u>

(vi) any corporation, partnership or trust with assets of not less than U.S.$100 million; <u>or</u>

(vii) any QIB; <u>or</u>

(viii) any entity all the equity of which is owned by one or more Eligible Institutional Investors.

"Eligible Interest" has the meaning specified in the Floating Rate Bond Exchange Agreement.

"Escrow Accounts" has the meaning specified in Section 3.05(a) hereof.

"Escrow Agent" means the commercial bank or trust company or official bank or financial institution appointed by the Closing Agent to act as escrow agent pursuant to Section 3.05(a) hereof and any successor escrow agent appointed by the Closing Agent.

"Escrow Agreement" means the escrow agreement between the Escrow Agent and the Closing Agent (and consented to by Argentina), in form and substance satisfactory to the Closing Agent.

"Escrow Release Date" means the Business Day selected by Argentina and the Closing Agent occurring not later than the Escrow Termination Date on which all of the conditions specified in Section 2.04 hereof shall have been satisfied or waived in accordance with that section.

"Escrow Termination Date" means September 1, 1993 (or, if such date is not a Business Day, the next succeeding Business Day).

"Escrowed Bond Amount" for the Discount Series L, the Par Series L, the DMK Discount Series and the DMK Par Series means an aggregate principal amount of Escrowed Principal Bonds of such Series to be deposited in the appropriate Escrow Account, as calculated pursuant to Section 2.06(a)(iv) hereof.

"Escrowed Principal Bonds" for the Discount Series L, the Par Series L, the DMK Discount Series and the DMK Par Series means Principal Bonds issued and outstanding in respect of Unreconciled ED and registered in the name of the Escrow Agent or, as the case may be, a bank selected by the Escrow Agent, as evidenced in the case of Principal Bonds denominated in U.S. Dollars, by a beneficial interest of the Escrow Agent in the U.S. Temporary Escrow Global Principal Bond for such Series and in the case of Principal Bonds denominated in Deutsche Mark, by a beneficial interest in a DMK Global Bearer Bond.

"Euroclear" means Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear Clearance System.

"European Currency Unit" or "ECU" means, at any
time, the aggregate of the Specified Component Amounts in
effect at such time of the respective
Component Currencies in use at any such time.
"Component Currency" in use at any time means any of
the currencies which is at such time a component of
the European Currency Unit, as determined by the
most recent relevant published regulations of the
European Economic Community.   "Specified Component
Amount" of a Component Currency, as in effect at any
time, means the amount of such Component Currency
specified by the most recent relevant published
regulations of the European Economic Community for
purposes of computing the value of a European
Currency Unit.

"Event of Default" has the meaning specified in
Section 10 of the Terms and Conditions to the
Principal Bonds.

"Exchange" means the simultaneous exchange of
Reconciled ED of the Purchasers for Principal Bonds
pursuant to this Agreement.

"Exchange Amount" for each Purchaser for a
Series for the Exchange Date or the Escrow Release
Date, as the case may be, means the aggregate
principal amount of Principal Bonds of such Series
to be issued and delivered or released to such
Purchaser on the Exchange Date or the Escrow Release
Date, as the case may be, calculated as provided in
Section 2.06 hereof.

"Exchange Date" means the Business Day
occurring on or prior to May 31, 1993 (or such later
date as may be determined under Section 6.09(a)
hereof), on which all of the conditions specified in
Section 2.03 hereof shall have been satisfied or
waived in accordance with such Section; provided,
however, that the Exchange Date may not be scheduled
to occur during the period from March 10, 1993 to
March 31, 1993; provided further that, in any case,
the Exchange Date shall be the same day as the
"Exchange Date" under and as defined in the Floating
Rate Bond Exchange Agreement.

"Existing Agreements" means each Debt Agreement
and each other existing agreement with Argentina,
BCRA or any other Argentine Governmental Entity.

"Extended Fund Facility" means the Extended Fund Facility arrangement approved by the Executive Board of the IMF on March 31, 1992, as modified, amended and supplemented from time to time.

"External Indebtedness" means, for any Person, Indebtedness payable by its terms, or which at the option of the holder thereof may be payable, in a currency other than Pesos; provided that Domestic Foreign Currency Indebtedness shall not constitute External Indebtedness.

"Final Trading Date" means August 7, 1992.

"Fiscal Agency Agreement" means each of the USD Fiscal Agency Agreement and the DMK Fiscal Agency Agreement.

"Fiscal Agent" means, as applicable, Citibank, N.A. (and any successor) as Fiscal Agent under the USD Fiscal Agency Agreement and as Fiscal Agent under the DMK Fiscal Agency Agreement.

"Floating Rate Bond" means each Floating Rate Bond of each Series substantially in the form of Exhibit 1A, 1B, 2A, 2B, 2C or 2D to the Floating Rate Bond Exchange Agreement.

"Floating Rate Bond Exchange Agreement" means the Floating Rate Bond Exchange Agreement dated the date hereof among Argentina (on its behalf and on behalf of each other Obligor), the Closing Agent, the Debt Agreement Agents parties thereto, the Promissory Note Agent and the Purchasers party thereto, as amended and in effect from time to time.

"Frankfurt Process Agent" has the meaning specified in Section 6.07(b) hereof.

"French Francs" or "FFF" means lawful currency of the Republic of France.

"General Solicitation Methods" means any form of general solicitation or general advertising (including the entry of quotations on any screen based pricing system of general availability).

"German Clearing System" means the clearing system operated by Deutscher Kassenverein AG and any successor thereto.

12

"Global Principal Bonds" means, collectively, the U.S. Global Principal Bonds, the Non-U.S. Global Principal Bonds and the DMK Global Bearer Bonds.

"IADB" means the Inter-American Development Bank and any successor.

"IBRD" means the International Bank for Reconstruction and Development and any successor.

"IMF" means the International Monetary Fund and any successor.

"Indebtedness" means, for any Person, (a) all indebtedness of such Person for or in connection with borrowed money, or the deferred purchase price of property or services (including, but not limited to, reimbursement obligations of such Person under or in respect of letters of credit or bankers' acceptances and obligations of such Person to repay deposits with or advances to such Person and a forfeit indebtedness); (b) all obligations of such Person (other than those specified in clause (a) above) evidenced by bonds, debentures, notes or other similar instruments; and (c) all direct or indirect guarantees of such Person in respect of, and all obligations (contingent or otherwise) of such Person to purchase or otherwise acquire or otherwise to assure a credit against loss in respect of, indebtedness or obligations of any other Person specified in clause (a) or (b) above.

"Interest Collateral" has the meaning specified in each of the Collateral Pledge Agreements.

"Interest Collateral Amount" means, for any Series of Principal Bonds, the Interest Collateral Amount for such Series of Principal Bonds determined in accordance with Schedule C hereto.

"Italian Lire" or "LRA" means lawful currency of the Republic of Italy.

"Japanese Yen" or "YEN" means lawful currency of Japan.

"Judgment Currency" has the meaning specified in Section 6.08(b) hereof.

13

"London Process Agent" has the meaning specif
Section 6.07(b) hereof.

"Majority Purchasers" means, at any time of
determination, Purchasers having more than 50% of the
U.S. Dollar equivalent (as determined in accordance with
Section 6.14 hereof) of the aggregate amount, at such
time of determination, of the Reconciled ED and
Unreconciled ED of all Purchasers.

"Minimum Amounts" means the aggregate face amount of
U.S.$1,000,000 or such lesser face amount if it
represents a Purchaser's total entitlement to a Series of
Principal Bonds.

"Minimum Discount Level" for a Principal Bond
Currency means (i) in the case of U.S. Dollars, that 35%
of the aggregate principal amount of the USD Equivalent
of Eligible Debt (to the extent such Eligible Debt is
being exchanged for Principal Bonds denominated in U.S.
Dollars) of all Purchasers executing this Agreement on or
prior to December 30, 1992 is committed to be exchanged
for Discount Bonds and (ii) in the case of Deutsche Mark,
that 35% of the aggregate principal amount of the DMK
Equivalent of Eligible Debt (to the extent such Eligible
Debt is being exchanged for Principal Bonds denominated
in Deutsche Mark) of all Purchasers executing this
Agreement on or prior to December 30, 1992 is committed
to be exchanged for Discount Bonds.

"Minimum Multiple" means, for any Series of
Principal Bonds, the amount specified below for the
Principal Bond Currency for such Series of Principal
Bonds:

| Principal Bond Currency | Minimum Multiple | |
|---|---|---|
| Deutsche Mark | DMK | 5,000 |
| U.S. Dollars | USD | 1,000 |

"New York Process Agent" has the meaning specified
in Section 6.07(b) hereof.

"1985 TCA" means the Term Credit Agreement dated as
of August 1, 1985 among BCRA, Argentina, as guarantor,

14

Citibank, N.A., as agent, and the banks party thereto, as amended and restated as of August 1, 1987 and as further amended as of March 1, 1988.

"1987 BNA Refinancing Agreement" means the Refinancing Agreement dated as of August 1, 1987 among Banco de la Nación Argentina, as borrower, Manufacturers Hanover Trust Company, as agent, and the banks party thereto.

"1987 GRA" means the Guaranteed Refinancing Agreement dated as of August 1, 1987 among the borrowers listed therein, BCRA, Argentina, as guarantor, the syndicate agents named therein and the banks party thereto.

"1987 Provincia Refinancing Agreement" means the Refinancing Agreement, dated as of August 1, 1987, among Banco de la Provincia de Buenos Aires, as borrower, The Bank of New York, as agent, and the banks party thereto.

"1987 TCA" means the Term Credit Agreement dated as of August 1, 1987, among BCRA, Argentina, as guarantor, Citibank, N.A., as agent, and the banks party thereto, as amended as of March 1, 1988.

"1983 TCA" means the Term Credit Agreement dated as of August 16, 1983, among BCRA, Argentina, as guarantor, Citibank, N.A., as agent, and the banks party thereto, as amended and restated as of August 1, 1987 and as further amended as of March 1, 1988.

"1992 Financing Plan" means the Republic of Argentina 1992 Financing Plan dated June 23, 1992 sent to the International Banking Community with the communication dated June 23, 1992, and a supplemental communication dated November 10, 1992 both, from the Minister of Economy and Public Works and Services of Argentina.

"Non-U.S. Global Discount Bonds" means the Non-U.S. Global Discount Bond issued by Argentina in respect of each Series of Discount Bonds (other than the DMK Discount Series Bonds), substantially in the form of Exhibit 2A.

"Non-U.S. Global Par Bonds" means the Non-U.S. Global Par Bonds issued by Argentina in respect of each

15

Series of Par Bonds (other than the DMK Par Series Bonds), substantially in the form of Exhibit 2A.

"Non-U.S. Global Principal Bonds" means the Non-U.S. Global Discount Bonds and the Non-U.S. Global Par Bonds.

"Non-U.S. Offering" means the offering of the Principal Bonds outside the United States pursuant to Regulation S.

"Non-U.S. Person" means any Person other than a U.S. Person.

"Non-U.S. Purchaser" means any Purchaser other than a U.S. Purchaser.

"Obligor" has the meaning specified in the introductory paragraph hereof.

"Obligor Consent" means the Obligor Consent in the form of Exhibit 6 hereto.

"Offering" means each of the U.S. Offering and the Non-U.S. Offering.

"Option" means any option or right to acquire Principal Bonds, it being understood that Eligible Debt shall not be considered an Option.

"Original Currency" has the meaning specified in Schedule B hereto.

"Other Applicable Taxes" has the meaning specified in Section 6.06(b) hereof.

"Par Bond" means each Par Bond (a) of each Series (other than the DMK Par Series Bonds (as defined in the DMK Fiscal Agency Agreement)) (including the U.S. Global Par Bonds and Non-U.S. Global Par Bonds), substantially in the forms of Exhibits 1 and 2A, and (b) of the DMK Par Series Bonds (in permanent global form), the execution copy and controlling version to be in the German language and to contain terms substantially the same as those set forth in the English translation of the DMK Bonds attached as Exhibit 2B hereto.

"Par Series L" has the meaning specified in Section 1(a) of the USD Fiscal Agency Agreement.

16

"<u>Paying Agency Taxes</u>" has the meaning specified in Section 6.06(a) hereof.

"<u>Paying Agent</u>" has the meaning specified in the USD Fiscal Agency Agreement.

"<u>Person</u>" means an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other juridical entity, or a sovereign state or any agency or political subdivision thereof.

"<u>Pesos</u>" means lawful currency of Argentina.

"<u>Portuguese Escudos</u>" or "<u>ESC</u>" means lawful currency of the Republic of Portugal.

"<u>Pounds Sterling</u>" or "<u>STG</u>" means lawful currency of the United Kingdom.

"<u>Principal Bond Agreements</u>" means this Agreement, the Principal Bonds, each Fiscal Agency Agreement, each Collateral Pledge Agreement, the Obligor Consent, the BCRA Undertaking and any other agreement or instrument or document delivered hereunder or thereunder which may be necessary for the Exchange.

"<u>Principal Bond Currency</u>" means each of Deutsche Mark and U.S. Dollars.

"<u>Principal Bonds</u>" means the Discount Bonds and Par Bonds of each Series.

"<u>Principal Collateral</u>" has the meaning specified in the Collateral Pledge Agreement.

"<u>Principal Collateral Amount</u>" means, for any Series of Principal Bonds, the Principal Collateral Amount for such Series of Principal Bonds determined in accordance with Schedule C hereto.

"<u>Process Agents</u>" has the meaning specified in Section 6.07(b) hereof.

"<u>Promissory Note Agent</u>" has the meaning specified in the introductory paragraph hereof.

"<u>Promissory Notes</u>" means (i) the instruments issued by Argentina and BCRA pursuant to BCRA Communications

17

A-251, A-695, A-696, A-697, A-790, A-893, A-894, A-895, A-946 and A-956, as amended or supplemented, (ii) the instruments issued pursuant to BCRA Communications A-1084, A-1122, A-1274, A-1745 and A-1963 and (iii) all bonds, promissory notes or other contractual obligations maturing prior to the Exchange Date (whether in accordance with their original schedules or otherwise), in each case, which are eligible to be exchanged for the instruments issuable pursuant to BCRA Communications A-1084 and A-1122.

"Public Sector Onlending Agreements" means any agreement documenting an Additional Loan (as defined in the 1983 TCA and the 1985 TCA) or an Investment Fund Loan (as defined in the 1987 TCA) to any Argentine public sector borrower.

"Purchasers" has the meaning specified in the introductory paragraph hereof.

"Purchasing Office" means, with respect to each Purchaser, the office or Affiliate of such Purchaser specified opposite its name on Schedule A hereto or any other office or Affiliate of such Purchaser hereafter selected and notified to Argentina and the Closing Agent from time to time by such Purchaser in accordance with Section 6.10(a) hereof.

"QIB" means a "Qualified Institutional Buyer" within the meaning of Rule 144A promulgated under the Securities Act.

"Qualifying Non-U.S. Person" means a Non-U.S. Person who represents and agrees that it will only offer or sell Principal Bonds (a) to a Qualifying Non-U.S. Person outside the United States, (b) to a Qualifying U.S. Fiduciary or (c) with respect to U.S. When-Issued Principal Bonds only, in the United States without using any General Solicitation Methods (i) to a Qualifying QIB in Minimum Amounts or (ii) after the signing of this Agreement, to the Purchasers listed on the signature pages hereof.

"Qualifying QIB" means a U.S. Person who is a QIB who represents and agrees (a) that the Principal Bonds or Options have not been registered under the Securities Act, (b) that it will not reoffer or resell the Principal Bonds or Options except (i) before issuance of the Principal Bonds, (A) to another Qualifying QIB in Minimum

Amounts without using any General Solicitation Methods, (B) after the signing of this Agreement, to the Purchasers listed on the signature pages hereof without using any General Solicitation Methods or (C) to a Qualifying Non-U.S. Person outside the United States or to a Qualifying U.S. Fiduciary and (ii) after the issuance of the Principal Bonds, pursuant to the transfer restrictions referred to in Section 6 of the USD Fiscal Agency Agreement, (c) that it was not induced to buy such Principal Bonds by means of any General Solicitation Methods and (d) that it will obtain from any QIB to whom it resells representations and agreements substantially as set forth in clauses (a), (b), (c) and (d) of this definition.

"Qualifying U.S. Fiduciary" means a U.S. broker/dealer or other fiduciary acting on behalf of a Non-U.S. Person in accordance with Rule 902(o)(2) of Regulation S under the Securities Act where such broker/dealer or other fiduciary represents and agrees that neither it nor any such Non-U.S. Person will reoffer or resell except to a Qualifying Non-U.S. Person outside the United States.

"Recognized Holder" means:

(a) with respect to Eligible Debt, (i) the holder of record of such Eligible Debt under the applicable Debt Agreement or (ii) any Affiliate of such holder of record which is designated in writing by such holder of record as entitled to be treated as the holder of record of such Eligible Debt for all purposes hereunder; and

(b) with respect to Eligible Interest, (i) the holder of record of the Eligible Debt related to such Eligible Interest or (ii) any Person designated in writing by such holder of record or other Recognized Holder to be entitled to all or any portion of the Eligible Interest in respect of a particular item of Eligible Debt.

"Reconciled ED" of a Purchaser means (i) on any day, each item of Eligible Debt or any portion thereof as to which, on or prior to such day, the relevant Debt Agreement Agent (or, in the case of Eligible Debt arising under the Promissory Notes, the Promissory Note Agent), Argentina, such Purchaser and the Closing Agent have agreed, following the reconciliation process, that such

19

Purchaser is the Recognized Holder and (ii) for the Exchange Date or the Escrow Release Date, the USD Equivalent (in the case of Reconciled ED to be exchanged for Principal Bonds denominated in U.S. Dollars) or DMK Equivalent (in the case of Reconciled ED to be exchanged for DMK Bonds) of such Purchaser's Reconciled ED on the Exchange Date or the Escrow Release Date, as the case may be; provided, however, that Reconciled ED of a Purchaser as of any day following the Exchange Date or the Escrow Release Date, as the case may be, shall not include the Reconciled ED of such Purchaser which has been discharged on the Exchange Date or the Escrow Release Date, as the case may be, pursuant to Section 2.02 hereof. The amount of each Purchaser's Reconciled ED shall be as set forth on Schedule A hereto (after giving effect to any adjustments to Schedule A pursuant to Section 6.01 hereof).

"Reconciliation Cut-Off Date" for the Exchange Date or the Escrow Release Date, as the case may be, means the 20th calendar day preceding the anticipated date for the Exchange Date or the Escrow Release Date, as the case may be, as notified by the Closing Agent pursuant to Section 2.05(a) hereof.

"Registrar" has the meaning specified in the USD Fiscal Agency Agreements.

"Regulation S" means Regulation S promulgated on April 24, 1990 under the Securities Act, as in effect from time to time.

"Requisite Purchasers" has the meaning specified in Section 5.02(a) hereof.

"Reset Date" has the meaning specified in Section 2.11(b) hereof.

"Residual Bond Amount" for each of the Discount Series L, the Par Series L, the DMK Discount Series and the DMK Par Series means an amount calculated for such Series pursuant to Section 2.06(b)(iv).

"Salto Grande GRA" means the Guaranteed Refinancing Agreement dated as of December 1, 1987 among Comision Tecnica Mixta de Salto Grande, as borrower, Argentina, BCRA, the banks party thereto and The Bank of New York, as syndicate agent for such banks.

20

"<u>Securities Act</u>" means the Securities Act of 1933 of the United States, as amended and in effect from time to time.

"<u>Securities Act Legend</u>" means the following legend, printed in capital letters:

THIS BOND HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY IN THE UNITED STATES OF AMERICA, ITS TERRITORIES OR POSSESSIONS, OR TO OR FOR THE ACCOUNT OF ANY U.S. PERSON (AS DEFINED IN REGULATION S OF THE UNITED STATES SECURITIES ACT OF 1933), EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR IN A TRANSACTION NOT REQUIRING REGISTRATION UNDER SUCH ACT. THIS PRINCIPAL BOND IS TRANSFERABLE ONLY AS PROVIDED HEREIN AND IN THE FISCAL AGENCY AGREEMENT REFERRED TO BELOW.

"<u>Series</u>" means each of the Series of Discount Bonds and Par Bonds which may be issued for each Principal Bond Currency, including each of (i) the Discount Series L, Discount Series U (as defined in the USD Fiscal Agency Agreement), Par Series L and Par Series U (as defined in the USD Fiscal Agency Agreement) and (ii) the DMK Par Series and DMK Discount Series.

"<u>Spanish Pesetas</u>" or "<u>PTA</u>" means lawful currency of the Kingdom of Spain.

"<u>Supplemental Schedule</u>" means, for any Purchaser, each Supplemental Schedule included as Exhibit 1 to the Commitment Telex completed and submitted to the Closing Agent by such Purchaser identifying the Eligible Debt of such Purchaser, as supplemented or otherwise amended in accordance with the procedures set forth in Annex B to the 1992 Financing Plan.

"<u>Supplementary Conversion Date</u>" has the meaning specified in Schedule B hereto.

"<u>Swiss Francs</u>" or "<u>SSF</u>" means lawful currency of the Swiss Confederation.

"<u>Termination Date</u>" has the meaning specified in Section 6.09(a) hereof.

21

"<u>Terms and Conditions</u>" means the provisions set forth under the "Terms and Conditions of Bonds" endorsed on the reverse of the Principal Bonds denominated in U.S. Dollars.

"<u>Translation Rate</u>" has the meaning specified in Schedule B hereto.

"<u>Translation Rate Determination Date</u>" has the meaning specified in Schedule B hereto.

"<u>United States</u>" and "<u>U.S.</u>" each means the United States of America; <u>provided</u> that, as used in Article III, in Section 4.02(k) and in the definition of "U.S. Person" below, "<u>United States</u>" means the United States of America, its territories and possessions, any State of the United States and the District of Columbia.

"<u>Unreconciled ED</u>" of a Purchaser means (i) on any day, the U.S. Dollar equivalent (as determined in accordance with Section 6.14 hereof) of the Eligible Debt claimed by such Purchaser as indicated in the Supplemental Schedule of such Purchaser less the Reconciled ED of such Purchaser for such day, (ii) for the Exchange Date, the USD Equivalent or the DMK Equivalent, as the context requires, of the Unreconciled ED claimed by such Purchaser as indicated in the statement sent by the Closing Agent pursuant to Section 2.05(b) for the Exchange Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b) hereof) and (iii) for the Escrow Release Date, the USD Equivalent or the DMK Equivalent, as the context requires, of the Unreconciled ED claimed by such Purchaser as indicated in the statement sent by the Closing Agent pursuant to Section 2.05(b) for the Escrow Release Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b) hereof) other than such Unreconciled ED which pursuant to Section 3.05(b) hereof is not considered to be Unreconciled ED of such Purchaser; <u>provided</u>, <u>however</u>, that, in calculating the Unreconciled ED of any Purchaser, the provisions of Section 2.06(c) shall apply and, <u>provided</u>, <u>further</u>, that Unreconciled ED shall not include any Eligible Debt which has been included in the Reconciled ED of any Purchaser. The amount of each Purchaser's Unreconciled ED shall be as set forth on Schedule A hereto (after giving effect to adjustments to Schedule A pursuant to Section 6.01 hereof).

"<u>U.S. Dollars</u>" or "<u>U.S.$</u>" or "<u>USD</u>" means lawful currency of the United States.

"U.S. Global Principal Bonds" means the U.S. Temporary Escrow Global Discount Bond, the U.S. Temporary Escrow Global Par Bond, the U.S. Temporary Global Discount Bonds and the U.S. Temporary Global Par Bonds.

"U.S. Offering" means the offering of the Principal Bonds in the United States pursuant to Section 4(2) of the Securities Act.

"U.S. Person" means (i) any natural person resident in the United States; (ii) any partnership or corporation organized or incorporated under the laws of the United States; (iii) any estate of which any executor or administrator is a U.S. Person; (iv) any trust of which any trustee is a U.S. Person; (v) any agency or branch of a foreign entity located in the United States; (vi) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (vii) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (viii) any partnership or corporation if (A) organized or incorporated under the laws of any foreign jurisdiction and (B) formed by a U.S. Person principally for the purpose of investing in securities not registered under the Securities Act unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts; provided, however, that the following shall not be deemed to be U.S. Persons:

    (1)  any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a Non-U.S. Person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States;

    (2)  any estate of which any professional fiduciary acting as an executor or administrator is a U.S. Person if (i) another executor or administrator who is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate and (ii) the estate is governed by foreign law;

23

(3)  any trust of which any professional fiduciary acting as a trustee is a U.S. Person if (i) another trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets and (ii) no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person;

(4)  any branch or agency of a U.S. bank or insurance company located outside the United States if such agency or branch (i) operates for valid business reasons, (ii) is engaged in the banking or insurance business and (iii) is subject to substantive local banking or insurance regulation; and

(5)  multinational entities such as the United Nations, the International Monetary Fund, the International Bank for Reconstruction and Development, the various development banks and their agencies, affiliates and pension plans.

"U.S. Purchaser" means any Purchaser that is (i) a "United States person" (as defined in Section 7701(a)(30) of the Code) or (ii) a U.S. Person; provided, however, that a U.S. Purchaser shall not include a foreign branch of a United States "financial institution" (as defined in U.S. Treasury Regulations Section 1.165-12(c)(1)(v)) that agrees to comply with the requirements of Section 165(j)(3)(A), (B) or (C) of the Code.

"U.S. Temporary Escrow Global Discount Bond" means the U.S. Temporary Escrow Global Discount Bond issued by Argentina in respect of the Discount Series L Bonds, substantially in the form of Exhibit 2C.

"U.S. Temporary Escrow Global Par Bond" means the U.S. Temporary Escrow Global Par Bond issued by Argentina in respect of the Par Series L Bonds, substantially in the form of Exhibit 2C.

"U.S. Temporary Escrow Global Principal Bond" means a U.S. Temporary Escrow Global Discount Bond or a U.S. Temporary Escrow Global Par Bond.

"U.S. Temporary Global Discount Bonds" means the U.S. Temporary Global Principal Bonds issued by Argentina

24

in respect of each Series of Discount Bonds (other than the DMK Discount Series Bonds), substantially in the form of Exhibit 2A.

"U.S. Temporary Global Par Bond" means the U.S. Temporary Global Principal Bonds issued by Argentina in respect of each Series of Par Bonds (other than the DMK Par Series Bonds), substantially in the form of Exhibit 2A.

"U.S. When-Issued Principal Bonds or Options" means any Principal Bond or Option to be acquired by a Non-U.S. Person pursuant to either subclause (A)(2) of Section 4.02(j)(vi) hereof or subclause (C) of Section 4.02(j)(vii) hereof.

"USD Equivalent" means (i) of any amount of Eligible Debt denominated in an Original Currency other than U.S. Dollars, a U.S. Dollar amount calculated on the basis of the Translation Rate applicable to such Original Currency and (ii) of any amount of Eligible Debt denominated in U.S. Dollars, such U.S. Dollar amount.

"USD Fiscal Agency Agreement" means the USD Discount Bond and Par Bond Fiscal Agency Agreement between Argentina and the Fiscal Agent thereunder, substantially in the form of Exhibit 4A hereto, as amended and in effect from time to time.

"Waiver and Amendment Request" means the request for waivers and amendments dated June 23, 1992 set forth by Argentina in Part III of the 1992 Financing Plan.

"Waiver" means, with respect to a Purchaser party to any Existing Agreement, the favorable responses given by such Purchaser to the Waiver and Amendment Request.

"Working Committee for Argentina" means the following group of thirteen banks which has acted as a communications link between Argentina and the International Banking Community: Bank of America National Trust and Savings Association, The Bank of Tokyo, Ltd., The Chase Manhattan Bank (National Association), Chemical Bank, Citibank, N.A., Crédit Lyonnais, Crédit Suisse, Dresdner Bank AG, Lloyds Bank Plc, Midland Bank plc, Morgan Guaranty Trust Company of New York, Royal Bank of Canada and The Sanwa Bank, Ltd.

25

SECTION 1.02.  <u>References to Articles, Etc.</u>  Any
reference to Articles, Sections, Exhibits, Annexes or
Schedules, unless expressly otherwise provided herein, shall
be references to Articles, Sections, Exhibits, Annexes or
Schedules to or of this Agreement.

26

## ARTICLE II

## THE EXCHANGE

SECTION 2.01.   Exchange of Eligible Debt.
(a)   Exchange Date.   Subject to the conditions precedent set
forth in Section 2.03 hereof and in accordance with the other
terms and conditions of this Agreement, Argentina shall on
the Exchange Date:

(i)   issue and deliver to the Common Depositary and
the Registrar for the account of the Purchasing Offices
of each Purchaser, in exchange for such Purchaser's
Reconciled ED as required by Section 2.02 hereof,
Principal Bonds of each Series in an aggregate principal
amount equal to the Exchange Amount of such Purchaser for
such Series for the Exchange Date; and

(ii)   issue in the name of and deliver to the Escrow
Agent a U.S. Temporary Escrow Global Principal Bond for
each of the Discount Series L and the Par Series L or, in
the case of the DMK Discount Series and the DMK Par
Series, issue and deliver to the German Clearing System a
beneficial interest in the DMK Global Bearer Bond for
such Series for credit to the account of a bank or
financial institution selected by the Escrow Agent, in
each case, for the benefit of the Purchasers pursuant to
this Agreement in an aggregate principal amount equal to
the Escrowed Bond Amount for such Series.

(b)   Escrow Release Date.   Subject to the conditions
precedent set forth in Section 2.04 hereof and in accordance
with the other terms and conditions set forth in this
Agreement, on the Escrow Release Date, in exchange for each
Purchaser's Reconciled ED as required by Section 2.02 hereof,
and subject to such Purchaser's compliance with Section
2.02(b) hereof, Principal Bonds shall be released to the
Purchasing Offices of each Purchaser entitled thereto in
accordance with Section 3.05 hereof.

(c)   Argentine Bank Exchange.   At least 45 days
prior to the Exchange Date, upon notice to Argentina and the
Closing Agent, an Argentine Bank may elect not to participate
in the Exchange.   In such event, Argentina agrees to arrange
for an exchange pursuant to which, on the Exchange Date, such
Argentine Bank may exchange its Eligible Debt for unsecured
bonds of Argentina on terms and conditions no more favorable
than the Principal Bonds being exchanged hereunder.   The
unsecured bonds to be issued to such Argentine Bank may, at a

27

future date, be exchanged, with an allocation between Par
Bonds and Discount Bonds no more favorable than the
allocation available to the Purchasers hereunder, for
Principal Bonds purchased or otherwise acquired by
Argentina.  Argentine Banks electing to participate in such
exchange for unsecured bonds shall exchange their Eligible
Debt on the Exchange Date, and such Eligible Debt shall be
deemed paid and discharged as of the earlier of March 31,
1993 and the Exchange Date.

SECTION 2.02.  <u>Exchange and Discharge; Forbearance</u>.
(a)  Subject to the conditions precedent set forth in Section
2.03 hereof in the case of the Exchange Date or Section 2.04
hereof in the case of the Escrow Release Date, as the case
may be, and in accordance with the other terms and conditions
of this Agreement, each Purchaser will, (i) on the Exchange
Date, exchange its Reconciled ED for Principal Bonds received
by such Purchaser's Purchasing Office on the Exchange Date
and (ii) on the Escrow Release Date, exchange its Reconciled
ED for Principal Bonds received by such Purchaser's
Purchasing Office on the Escrow Release Date.  Upon (i) the
issuance and delivery of Principal Bonds pursuant to Section
2.01(a)(i) or (ii) the release of Principal Bonds to each
Purchaser's Purchasing Office entitled thereto pursuant to
Section 2.01(b) hereof or in connection with an interpleader
or otherwise, as and when such Principal Bonds are issued or
released the portion of the Eligible Debt relating to
Reconciled ED with respect to which such Principal Bonds were
so issued or released shall be deemed paid and discharged as
of the earlier of March 31, 1993 and the Exchange Date and no
interest shall be deemed to have accrued on such Eligible
Debt from and after such earlier date.  Nothing in this
Section 2.02 or any action taken to cancel or discharge such
Reconciled ED shall be deemed to constitute a discharge of
any interest obligations accrued prior to such earlier date
in respect of such discharged principal amounts or affect the
enforceability of such interest obligations, unless such
interest obligations are discharged pursuant to the terms and
conditions of the Floating Rate Bond Exchange Agreement.

(b)  During the period from the Exchange Date to the
Escrow Release Date, each Purchaser waives, and agrees not to
exercise or assert, any right or claim with respect to the
Unreconciled ED of such Purchaser or any other Purchaser in
respect of which Principal Bonds have been issued and
deposited in the appropriate Escrow Account.

28

SECTION 2.03.  Exchange Date.  The Exchange Date shall be the Business Day occurring on or prior to the Termination Date on which all of the conditions set forth below have been satisfied (or waived as provided herein):

(a)  The Closing Agent shall have received counterparts of this Agreement signed by Argentina, each Debt Agreement Agent, the Promissory Note Agent, the Closing Agent and each Purchaser, in sufficient number for distribution as provided in Section 6.16 hereof.

(b)  The Closing Agent shall have received ten executed originals (four of which shall be retained by the Closing Agent on behalf of the Purchasers and one of which shall be delivered to special New York counsel to the Closing Agent) of each of the documents listed below, each such document to be dated in accordance with the relevant Exhibit to the Closing Book and, in the case of each of the certificates delivered pursuant hereto, the statements set forth therein shall be true and correct:

(i)  copies certified by the Minister of Economy and Public Works and Services of Argentina of all Argentine Authorizations (with English translations) necessary for Argentina to execute, deliver and perform this Agreement, any other Principal Bond Agreement and the Amendments or for the validity or enforceability hereof or thereof and a certificate of the Minister of Economy and Public Works and Services of Argentina, in substantially the form of Exhibit A-1 to the Closing Book, to the effect that none of such Argentine Authorizations has been amended and each is in full force and effect;

(ii)  a certificate of the Secretary General of the Ministry of Economy and Public Works and Services of Argentina, in substantially the form of Exhibit A-2 to the Closing Book, as to the authority, incumbency and specimen signatures of the persons who have executed or will execute this Agreement and the other Principal Bond Agreements and the other instruments and documents to be executed and delivered hereunder or thereunder by Argentina;

(iii)  a certificate of the Minister of Economy and Public Works and Services of Argentina, in substantially the form of Exhibit A-3 to the Closing Book, to the effect that:

29

(A)  no default in the payment of principal or interest of which Argentina has been notified in writing on or prior to September 6, 1992 shall be continuing with respect to any medium-term and long-term External Indebtedness of Argentina or any Designated Argentine Governmental Agency as to which a commercial bank is the original creditor other than indebtedness under the Debt Agreements;

(B)  the Principal Collateral Amounts and the Interest Collateral Amounts for each Series of Principal Bonds have been calculated in accordance with Schedule C hereto and are set forth in Annex I to such certificate;

(C)  Argentina has obtained all waivers under the agreements governing the debt of, or guaranteed by, Argentina to the extent necessary to permit the implementation of this Agreement;

(D)  each of the representations and warranties made by Argentina in Section 4.01 hereof and in the other Principal Bond Agreements is true and correct on and as of the Exchange Date with the same force and effect as if made on and as of the Exchange Date;

(E)  Eligible Debt has continued to be eligible for Argentina's privatization program until the Exchange Date;

(F)  Argentina has (i) made an interest payment of at least U.S.$70,000,000 per month in respect of commercial bank indebtedness in each month since the date of the 1992 Financing Plan through and including the earlier of the month in which the Exchange Date occurs and March 1993, except to the extent any such monthly payment has been added to the Cash Payment as contemplated in Section 2.05(i) of the Floating Rate Bond Exchange Agreement and (ii) in the event that the Exchange Date shall not have occurred on or prior to April 7, 1993, deposited on or before the Exchange Date, to secure the payment of interest on the Principal Bonds due and payable on the first interest

30

payment date therefor, U.S.$70,000,000 in
respect of each of the months from April 1993
to and including the month in which the
Exchange Date occurs; and

(G)   the Principal Collateral and Interest
Collateral delivered by Argentina on the
Exchange Date pursuant to Section 3.01 and
4.01, respectively, of each of the Collateral
Pledge Agreements consist solely of the types
of collateral for which the forms of opinion
referred to in Section 2.03(b)(ix) hereof
include a form of perfection and first priority
opinion with respect to the security interest
of the Collateral Agent in such Principal
Collateral and Interest Collateral on the
Exchange Date;

(iv)  copies (with English translations)
certified by the President of BCRA, in substantially
the form of Exhibit A-4 to the Closing Book, of all
resolutions or other actions of the Board of
Directors of BCRA and all Argentine Authorizations,
in each case, necessary for BCRA to execute, deliver
and perform the BCRA Undertaking and the Obligor
Consent and for the validity or enforceability
thereof and designating the President of BCRA as the
officer authorized to execute and deliver such
documents and instruments;

(v)   a certificate of the Secretary of the
Board of Directors of BCRA in substantially the form
of Exhibit A-5 to the Closing Book as to the
authority, incumbency and specimen signature of the
President of BCRA;

(vi)  a certificate of the Minister of Economy
and Public Works and Services of Argentina and of
Citibank, N.A., as Closing Agent, substantially in
the form of Exhibit A-6 to the Closing Book as to:

(A)  the satisfaction (or waiver) of the
conditions to the Exchange Date under (and as
defined in) the Floating Rate Bond Exchange
Agreement; and

(B)  the substantial completion of the
reconciliation to identify the Recognized
Holders of the Eligible Debt;

31

(vii)  an opinion of the <u>Procurador del Tesoro de la Nación</u> (Attorney of the National Treasury of Argentina), substantially in the form of Exhibit A-7 to the Closing Book;

. (viii)  an opinion of the General Counsel of BCRA, in substantially the form of Exhibit A-8 to the Closing Book;

(ix)  opinions of (A) Cleary, Gottlieb, Steen & Hamilton, special New York, German and French counsel to Argentina and BCRA, substantially in the forms of Exhibits A-9A, A-9B and A-9C, respectively, to the Closing Book, (B) Linklaters & Paines, special English counsel to Argentina, substantially in the form of Exhibit A-9D to the Closing Book, (C) Bär & Karrer, special Swiss counsel to Argentina, substantially in the form of Exhibit A-9E to the Closing Book and (D) Nishimura & Sanada, special Japanese counsel to Argentina, substantially in the form of Exhibit A-9F to the Closing Book;

(x)  a certificate of the Minister of Economy and Public Works and Services of Argentina, as to Eligible Debt and Eligible Interest of Argentine Banks, substantially in the form of Exhibit A-10 to the Closing Book;

(xi)  a letter from the IMF, confirming that the Extended Fund Facility Arrangement remains in effect and that, with the exception of the set aside amounts for debt reduction operations, Argentina has made each purchase under the Extended Fund Facility Arrangement as to which the originally scheduled test date occurred at least 90 days prior to the Exchange Date, substantially in the form of Exhibit A-11 to the Closing Book;

(xii)  a certificate of the Collateral Agent, in substantially the form of Exhibit A-12 to the Closing Book, as to the Interest Collateral and Principal Collateral received and held by the Collateral Agent for each Series of Principal Bonds, which shall have an aggregate amount payable at maturity (including principal, interest and interest added to principal) not less than the Principal Collateral Amount for such Series of Principal Bonds (in the case of Principal Collateral) and have an aggregate Value (as defined in the Collateral Pledge

32

Agreements) not less than the Interest Collateral
Amount for such Series of Principal Bonds (in the
case of Interest Collateral);

(xiii)  an opinion of the General Counsel of the
Federal Reserve Bank of New York, substantially in
the form of Exhibit A-13 to the Closing Book;

(xiv)  opinions of Shearman & Sterling, special
New York and German counsel to the Working Committee
for Argentina and the Closing Agent, substantially
in the forms of Exhibits A-14A and A-14B,
respectively, to the Closing Book;

(xv)  an opinion of Gallo & Bruchou, special
Argentine counsel to the Working Committee for
Argentina and the Closing Agent, substantially in
the form of Exhibit A-15 to the Closing Book;

(xvi)  an opinion of Slaughter & May, special
English counsel to the Closing Agent, substantially
in the form of Exhibit A-16 to the Closing Book;

(xvii)  a letter from the New York Process Agent
for Argentina, substantially in the form of
Exhibit A-17A to the Closing Book;

(xviii)  a letter from the Alternate New York
Process Agent for Argentina, substantially in the
form of Exhibit A-17B to the Closing Book;

(xix)  a letter from the New York Process Agent
for Banco Central de la Republica Argentina,
substantially in the form of Exhibit A-17C to the
Closing Book;

(xx)  a letter from the Alternate New York
Process Agent for Banco Central de la Republica
Argentina, substantially in the form of
Exhibit A-17D to the Closing Book;

(xxi)  a letter from the London Process Agent for
Argentina, substantially in the form of
Exhibit A-18A to the Closing Book;

(xxii)  a letter from the Alternate London Process
Agent for Argentina, substantially in the form of
Exhibit A-18B to the Closing Book;

(xxiii)  a letter from the London Process Agent for Banco Central de la Republica Argentina, substantially in the form of Exhibit A-18C to the Closing Book;

(xxiv)  a letter from the Alternate London Process Agent for Banco Central de la Republica Argentina, substantially in the form of Exhibit A-18D to the Closing Book;

(xxv)  a letter from the Frankfurt Process Agent for Argentina, substantially in the form of Exhibit A-19A to the Closing Book; and

(xxvi)  a letter from the Frankfurt Process Agent for Banco Central de la Republica Argentina, substantially in the form of Exhibit A-19B to the Closing Book.

(c)  The Closing Agent shall have received ten counterparts of each of the following (each of which shall be dated as of the Exchange Date), four of which shall be retained by the Closing Agent on behalf of the Purchasers and one of which shall be delivered to special New York counsel to the Closing Agent:

(i)  each Collateral Pledge Agreement, executed by each party thereto;

(ii)  each Fiscal Agency Agreement, executed by each party thereto;

(iii)  the BCRA Undertaking, executed by BCRA;

(iv)  the Obligor Consent, executed by each party thereto;

(v)  the Amendments, executed by Argentina, the Obligors parties thereto and:

(A)  in the case of the amendments to each of the 1987 TCA, the 1985 TCA, the 1983 TCA and the Co-Financing Agreement, by the Majority Banks (as defined in the applicable Debt Agreement) and the agent under such Debt Agreement;

(B)  in the case of the amendments to the 1987 GRA, by the Majority Syndicate Banks (as

34

defined in the 1987 GRA) and syndicate agent
for each Borrower (as defined in the 1987 GRA)
thereunder;

(C)  in the case of amendments to the AUSA
GRA, the Salto Grande GRA and the Alianza
Naviera GRA, by the Majority Banks (as defined
in the applicable Debt Agreement) and the Agent
under such Debt Agreement; and

(D)  in the case of amendments to Public
Sector Onlending Agreements, by the requisite
banks and the agent, if any, in accordance with
the provisions of the applicable agreement;

(vi)  an order from Argentina to the
Authenticating Agent, in substantially the form of
Exhibit A-20 to the Closing Book, directing the
Authenticating Agent to authenticate the Global
Principal Bonds (other than the DMK Global Bearer
Bonds);

(vii)  a certificate of the Registrar,
substantially in the form of Exhibit A-21 to the
Closing Book, as to delivery in accordance with the
USD Fiscal Agency Agreement of the U.S. Global
Principal Bonds (other than the U.S. Temporary
Escrow Global Principal Bonds) referred to in
Section 3.02 hereof;

(viii)  a certificate of the Common Depositary,
substantially in the form of Exhibit A-22 to the
Closing Book, as to delivery in accordance with the
USD Fiscal Agency Agreement of the Non-U.S. Global
Principal Bonds referred to in Section 3.03 hereof;

(ix)  a receipt from the operator of the German
Clearing System for the DMK Bonds, in the form
customarily delivered by the operator of the German
Clearing System, acknowledging delivery of the DMK
Global Bearer Bonds for both Series of DMK Bonds
referred to in Section 3.04 hereof;

(x)  a letter to the Closing Agent from the
Luxembourg Stock Exchange, substantially in the form
of Exhibit A-25 to the Closing Book stating that
application has been made by Argentina for the
listing of the Par Series L Bonds and the Discount
Series L Bonds on the Luxembourg Stock Exchange; and

35

(xi)  the Escrow Agreement, executed by the Escrow Agent and the Closing Agent (and consented to by Argentina) and a certificate from the Escrow Agent as to receipt of the U.S. Temporary Escrow Global Principal Bonds referred to in Section 3.02 hereof.

(d)  Since June 23, 1992 and on or prior to the thirty-fifth day prior to the Exchange Date, there shall have been no adverse change in the financial or economic condition of Argentina which is material in the context of the Exchange.

(e)  The Closing Agent shall have received evidence satisfactory to the Closing Agent that Argentina has paid (A) all fees and expenses required to be paid to the Closing Agent and to the Agents (as defined in each Fiscal Agency Agreement) on or prior to the Exchange Date in accordance with Section 6.05 hereof, the letter referred to in Section 5.01(b) hereof, Section 10 of the USD Fiscal Agency Agreement and Section 10 of the DMK Fiscal Agency Agreement (including in each case, without limitation, fees and expenses of counsel as provided therein), (B) all costs and expenses of members of the Working Committee for Argentina required to be paid or reimbursed by Argentina on or prior to the Exchange Date in accordance with Section 6.05 hereof, (C) all costs and expenses of the Debt Agreement Agents and the Promissory Note Agent required to be paid or reimbursed by Argentina on or prior to the Exchange Date in accordance with Section 6.05 hereof (including, without limitation, fees and expenses of counsel as provided therein) and (D) all fees and expenses of Shearman & Sterling, special New York counsel to the Working Committee for Argentina and the Closing Agent, and Gallo & Bruchou, special Argentine counsel to the Working Committee for Argentina and the Closing Agent required to be paid or reimbursed by Argentina on or prior to the Exchange Date in accordance with Section 6.05 hereof, and deposited all amounts required to be deposited with the Closing Agent on or prior to the Exchange Date in accordance with each of the letter agreements, dated the date hereof, between Argentina and the Closing Agent relating to fees and expenses of counsel to the Working Committee for Argentina and the Closing Agent; provided that, except with respect to amounts required to be deposited, a statement, invoice or other claim in respect of any amount referred to above has been submitted to Argentina on or prior to the date 30 calendar days prior to the

36

Exchange Date. The payment of such fees, costs, expenses or other amounts referred to above in satisfaction of such condition precedent in this subsection (e) shall be without prejudice to the right of Argentina to contest in good faith any such payment.

Documentation that varies from the requirements of subsection (a), (b), or (c) above may be accepted, and the condition set forth in subsection (d) above may be waived, in each case, with the consent of Purchasers having at least 66-2/3% of the aggregate of the Reconciled ED and Unreconciled ED of all Purchasers for the Exchange Date; provided that, except as set forth below, with respect to any documentation relating specifically to any Series of Principal Bonds, documentation for such Series of Principal Bonds that varies from the above requirements may be accepted with the consent of Purchasers having at least 66-2/3% of the aggregate of the Reconciled ED and Unreconciled ED of all Purchasers for the Exchange Date to be exchanged for such Series of Principal Bonds or with respect to which Principal Bonds of such Series are to be escrowed on the Exchange Date. The condition referred to in Section 2.03(d) hereof shall be deemed to have been satisfied if, on or prior to the thirtieth day prior to the Exchange Date, the Closing Agent has not received notices from the Majority Purchasers that, as a result of a material adverse change described in Section 2.03(d) hereof, such condition has not been satisfied. Certificates, letters and opinions of the IMF, the Collateral Agent, the Registrar, the Common Depositary, the German Clearing System or the Luxembourg Stock Exchange or any official of any thereof which are required to be delivered pursuant to this Section 2.03 may be accepted in a form which varies from the relevant Exhibit to the Closing Book by agreement between Argentina and the Closing Agent.

SECTION 2.04. The Escrow Release Date. The Escrow Release Date shall be a Business Day selected jointly by Argentina and the Closing Agent occurring not later than the Escrow Termination Date on which all of the conditions set forth below shall have been satisfied (or waived as provided herein) (and, in the case of the conditions set forth in subsections (a)(i)-(iv), (b) and (c) below, Argentina agrees to take all actions as are necessary to satisfy such conditions or to cause such conditions to be satisfied):

(a) The Closing Agent shall have received ten executed originals (four of which shall be retained by the Closing Agent on behalf of the Purchasers and one of which shall be delivered to special New York counsel to

37

the Closing Agent) of each of the documents listed below, each such document to be dated in accordance with the relevant Exhibit to the Closing Book and, in the case of the certificates delivered pursuant hereto, the statements set forth therein shall be true and correct:

(i)   a certificate of the Common Depositary, substantially in the form of Exhibit B-1 to the Closing Book, to the effect that the Schedule to the Non-U.S. Global Principal Bond for each Series has been endorsed as instructed by Argentina and the Closing Agent pursuant to Section 3.05(c) hereof;

(ii)   a certificate of the Registrar, substantially in the form of Exhibit B-2A to the Closing Book, to the effect that the Schedule to the U.S. Temporary Global Discount Bonds and U.S. Temporary Global Par Bonds for each Series has been endorsed as instructed by Argentina and the Closing Agent pursuant to Section 3.05(c) hereof and a certificate of the Fiscal Agent, substantially in the form of Exhibit B-2B to the Closing Book, to the effect that the Schedule to the U.S. Temporary Escrow Global Discount Bond and the U.S. Temporary Escrow Global Par Bond has been endorsed as instructed by Argentina and the Closing Agent pursuant to Section 3.05(c) hereof;

(iii)   a copy of the report delivered to Argentina and the Fiscal Agent by the Collateral Agent (certified by an Authorized Official) as to the Interest Collateral and Principal Collateral received and held by the Collateral Agent for each Series of Principal Bonds, which Interest Collateral and Principal Collateral so received and held by the Collateral Agent shall have an aggregate amount payable at maturity (including principal, interest and interest added to principal) not less than the Principal Collateral Amount for such Series of Principal Bonds (in the case of Principal Collateral) and have an aggregate Value (as defined in the Collateral Pledge Agreements) not less than the Interest Collateral Amount for such Series of Principal Bonds (in the case of Interest Collateral), in each case, calculated in accordance with Schedule C hereto after giving effect to the

38

endorsement of the Global Principal Bonds in accordance with Section 3.05(c) hereof;

(iv) a certificate from the Minister of Economy and Public Works and Services of Argentina, in substantially the form of Exhibit B-3 to the Closing Book, to the effect that

(A) no Event of Default (as defined in the Terms and Conditions) or any event which with the passage of time or the giving of notice, or both, would constitute an Event of Default has occurred and is continuing on the Escrow Release Date; and

(B) the Principal Collateral and Interest Collateral transferred among Principal Collateral Accounts and Interest Collateral Accounts, respectively, pursuant to Section 5.07 of each of the Collateral Pledge Agreements consist solely of Permitted Investments existing in the form of an entry in the records of the Federal Reserve Bank of New York, in the case of the USD Collateral Pledge Agreement, and Permitted Investments deposited with the Deutcher Kassenverein Aktiengesellschaft in accordance with the procedures for the collective deposit (Sammelverwahrung) of securities under the law of the safekeeping of securities, in the case of the DMK Collateral Pledge Agreement, and the Interest Collateral and Principal Collateral delivered by Argentina pursuant to Sections 5.05 and 5.06, respectively, of each of the Collateral Pledge Agreements consist solely of the types of collateral for which the forms of opinion referred to in Section 2.03(b)(ix) hereof include a perfection and first priority opinion with respect to the security interest of the Collateral Agent in such types of collateral; and

(v) for each jurisdiction in which Principal Collateral or Interest Collateral that is delivered to, or transferred among, Principal Collateral Accounts and Interest Collateral Accounts on the Escrow Release Date pursuant to Article V of each of the Collateral Pledge Agreements is located, an opinion of the relevant counsel referred to in

39

Section 2.03(b)(ix) hereof as to the perfection and first priority of the security interests of the Collateral Agent in such Principal Collateral and Interest Collateral, substantially in the form of the form of such counsel's opinion included in the Closing Book.

(b)  If additional DMK Global Bearer Bonds are to be executed and delivered on the Escrow Release Date, the Closing Agent shall have received ten executed originals (four of which shall be retained by the Closing Agent on behalf of the Purchasers and one of which shall be delivered to special New York counsel to the Closing Agent), of each of the documents specified in subsection (vii) of Section 2.03(b) hereof and subsection (ix) of Section 2.03(c) hereof and an opinion of Cleary, Gottlieb, Steen & Hamilton, special German counsel to Argentina with respect to the execution and delivery of such additional DMK Global Bearer Bonds, substantially in the form of Exhibit A-9B to the Closing Book (to the extent applicable thereto).

(c)  The Closing Agent shall have received evidence satisfactory to the Closing Agent that Argentina has paid all costs, fees, expenses and other amounts of the type specified in Section 2.03(e) hereof which are required to be paid, or deposited, on or prior to the Escrow Release Date.  The payment of such fees, costs, expenses or other amounts referred to above in satisfaction of such condition precedent in this subsection (c) shall be without prejudice to the right of Argentina to contest in good faith any such payment.

Documentation that varies from the requirements of this Section 2.04 may be accepted with the consent of Purchasers having at least 66-2/3% of the aggregate of all Reconciled ED and Unreconciled ED of all Purchasers on the Escrow Release Date; <u>provided</u> that, except as set forth below, documentation relating specifically to any Series of Principal Bonds that varies from the above requirements may be accepted with the consent of Purchasers having at least 66-2/3% of the aggregate of all Reconciled ED and Unreconciled ED for the Escrow Release Date that is to be exchanged for such Series of Principal Bonds on the Escrow Release Date or with respect to which Principal Bonds of such Series were escrowed on the Exchange Date but are not to be released on the Escrow Release Date. Certificates, letters and opinions of the Collateral Agent, the Registrar, the Common Depositary, the German Clearing System or the Luxembourg Stock Exchange or any official of any thereof

40

which are required to be delivered pursuant to this Section
2.04 may be accepted by the Closing Agent in a form which
varies from the relevant Exhibit to the Closing Book.

SECTION 2.05.  Procedures for Exchange.  (a)  Not
less than 45 calendar days before the anticipated Exchange
Date and 35 calendar days before the anticipated Escrow
Release Date (as determined jointly by the Closing Agent and
Argentina), the Closing Agent shall notify the other parties
hereto of such anticipated date.  Argentina jointly with the
Closing Agent may, at any time prior to the anticipated
Exchange Date or the anticipated Escrow Release Date, as
applicable, which has been notified to the other parties
hereto under this Section 2.05(a), postpone the anticipated
Exchange Date or the anticipated Escrow Release Date, as
applicable, to a later date and the Closing Agent shall
notify the other parties hereto of such postponement and of
the new anticipated date.

(b)  At least 30 calendar days prior to the Exchange
Date or the Escrow Release Date, as the case may be, the
Closing Agent shall send to each Purchaser a statement
specifying (i) such Purchaser's Reconciled ED for such date
(or, if such Reconciled ED is subject to translation under
Section 2.08(a) hereof, the Reconciled ED of such Purchaser
for such date expressed in the Original Currency thereof
rather than its USD Equivalent), such Purchaser's Purchasing
Office(s) for Principal Bonds and such Purchaser's status as
a U.S. Person or Non-U.S. Person, as set forth in Schedule A,
(ii) such Purchaser's Unreconciled ED for such date,
(iii) the percentage of such Purchaser's Reconciled ED
allocated to be exchanged for each Series of Principal Bonds
and (iv) that such Purchaser has represented, pursuant to
this Agreement, that to the best of its knowledge, it owns
all of the Unreconciled ED indicated for such Purchaser on
such statement.  Each Purchaser shall have ten calendar days
to inform the Closing Agent of any change, correction or
modification to the information (other than such Purchaser's
percentage allocation of Reconciled ED as between Par Bonds
and Discount Bonds) presented on such statement and, if
requested, confirm its status as a U.S. Person or a Non-U.S.
Person, taking into account, among other things, such
Purchaser's Commitment Telex, the requirements of Regulation
S and the location of its Purchasing Office(s) for Principal
Bonds; provided, however, that if the Purchaser shall inform
the Closing Agent of any change in an item of Reconciled ED,
such item shall be deemed to be Unreconciled ED unless the
Closing Agent shall have given written notice to the
Purchaser not less than 10 calendar days prior to the