41

anticipated Exchange Date or the anticipated Escrow Release Date that the change has been confirmed by the appropriate Debt Agreement Agent and Argentina.  In addition, each Purchaser that has indicated on Schedule A hereto that it is a U.S. Person (or a Non-U.S. Person electing on such Schedule A to receive Principal Bonds pursuant to Section 4(2) of the Securities Act) shall upon request provide the Closing Agent with (A) the payment instructions of such Purchaser or Purchasing Office to which any payments should be sent, (B) the address of such Purchaser or Purchasing Office to which any notices should be sent and (C) a United States Internal Revenue Service Form W-9 or substitute form from such Purchaser or Purchasing Office(s).

(c)  Not less than 10 calendar days before the anticipated Exchange Date or the Escrow Release Date, as the case may be, the Closing Agent shall notify each Purchaser of such Purchaser's Exchange Amount for such date and shall confirm such Purchaser's Purchasing Office.

(d)  Not less than 9 calendar days before the anticipated Exchange Date or the Escrow Release Date, as the case may be, the Closing Agent shall deliver (i) to each Debt Agreement Agent and the Promissory Note Agent (with copies to Argentina) one or more notices identifying for each Purchaser under the Debt Agreement for which such Debt Agreement Agent, or the Promissory Note Agent, as the case may be, is the agent and in the aggregate for such Debt Agreement, all Reconciled ED (in each currency) outstanding under such Debt Agreement as of the date of such notice referred to in subsection (c) above which is to be exchanged for Principal Bonds on such date and (ii) to Argentina, in the case of the Exchange Date, the aggregate amount of Unreconciled ED in respect of which Principal Bonds are to be issued in escrow on such date.  Each Debt Agreement Agent and the Promissory Note Agent shall promptly, and in any event within 3 calendar days following receipt of such notice, confirm in writing to the Closing Agent and Argentina the amounts referred to in (i) above.

(e)  Not less than 5 calendar days before the anticipated Exchange Date or Escrow Release Date, as the case may be, Argentina shall confirm in writing to the Closing Agent the aggregate amounts referred to in Section 2.05(d)(i) and (ii) above.

(f)  The Closing Agent shall have no obligation to process any communication from any Purchaser received by the Closing Agent later than the Reconciliation Cut-Off Date for

42

the Exchange Date or the Escrow Release Date, as the case may be.

(g) On the Exchange Date, the Escrow Release Date and each date on which Principal Bonds are released to any Purchaser's Purchasing Office in connection with an interpleader or otherwise, as the case may be, the item, or portion thereof, of Eligible Debt related to the Reconciled ED of each Purchaser for such date which is exchanged for Principal Bonds on such date shall be cancelled, as contemplated in Section 2.02(a) hereof, and shall no longer exist and such Purchaser shall record on its books the cancellation of such Eligible Debt. Each Purchaser hereby authorizes and instructs the Closing Agent to notify and instruct the relevant Debt Agreement Agent to cancel such Eligible Debt of such Purchaser on such date and the Closing Agent hereby agrees to so notify and instruct each relevant Debt Agreement Agent. Upon receipt of any such notification and instruction from the Closing Agent, each Debt Agreement Agent shall on such date cancel, as of the earlier of March 31, 1993, and the Exchange Date, the Eligible Debt of a Purchaser specified in such notice and instruction; provided, however, that with respect to Eligible Debt evidenced by a Promissory Note, such Eligible Debt shall be cancelled on the records of the Promissory Note Agent only and such cancellation shall not be evidenced on the Promissory Note, and the Promissory Note shall not be destroyed, until such time as the conditions to the destruction and cancellation of Promissory Notes specified in Section 2.05(h) hereof are satisfied.

(h) No later than 30 days prior to the Exchange Date, each Purchaser shall deliver or cause to be delivered to the Promissory Note Agent the original of any Promissory Note evidencing Eligible Debt of such Purchaser. Any Promissory Note so delivered to the Promissory Note Agent shall be held in trust by the Promissory Note Agent for the benefit of such Purchaser and shall be accorded treatment substantially equal to that which the Promissory Note Agent accords its own property. The Promissory Note Agent shall not impose any fee on such Purchaser in connection with the delivery of a Promissory Note to the Promissory Note Agent, the custodial arrangements of the Promissory Note Agent or, if applicable, the redelivery to a Purchaser, or the delivery to a court, of such Promissory Note. No Promissory Note shall be destroyed or cancelled by the Promissory Note Agent or Argentina until all Eligible Debt and Eligible Interest represented thereby has been reconciled and Principal Bonds or Floating Rate Bonds, respectively, in respect thereof have

been issued or released from escrow, if applicable, in accordance with the terms of this Agreement and the Floating Rate Bond Exchange Agreement. Notwithstanding any other provision of this Agreement to the contrary, in the event that any Promissory Note issued prior to the Exchange Date is not so delivered, Argentina shall not be obligated to issue Principal Bonds in respect of Eligible Debt evidenced thereby unless the Purchaser provides Argentina with security or indemnity consistent with commercial practice.

(i)  As soon as practicable after the conditions for the Exchange Date or the Escrow Release Date, as the case may be, have been satisfied (or waived), the Closing Agent shall notify the Purchasers and each Debt Agreement Agent and the Promissory Note Agent, as the case may be, that such conditions have been satisfied or waived and shall specify the date on which the Exchange Date or the Escrow Release Date, as the case may be, occurred.

SECTION 2.06.  Calculation of the Exchange Amounts, Escrowed Bond Amounts and Residual Bond Amounts.  (a)  The Exchange Date.  (i)  Exchange Amounts.  As soon as practicable, but in no event less than 10 calendar days prior to the Exchange Date, the Closing Agent shall calculate each Purchaser's Exchange Amount for each Series for the Exchange Date.

(ii)  Discount Bonds.  The aggregate principal amount of each Series of Discount Bonds to be issued under Section 2.01(a)(i) hereof to each Purchaser (or, if applicable, its Purchasing Office) shall be equal to the product (rounded downward to the nearest Minimum Multiple for such Series) of (A) 65% of such Purchaser's Reconciled ED for the Exchange Date, as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Exchange Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b) hereof), multiplied by (B) the percentage of such Purchaser's Reconciled ED allocable to such Series in accordance with Section 2.07 hereof.

(iii)  Par Bonds.  The aggregate principal amount of each Series of Par Bonds to be issued under Section 2.01(a)(i) hereof to each Purchaser (or, if applicable, its Purchasing Office) shall be equal to the product (rounded downward to the nearest Minimum Multiple for such Series) of (A) 100% of such Purchaser's Reconciled ED for the Exchange Date, as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Exchange Date (as such statement may be modified by such Purchaser

44

pursuant to Section 2.05(b) hereof), multiplied by (B) the percentage of such Purchaser's Reconciled ED allocable to such Series in accordance with Section 2.07 hereof.

(iv) Escrowed Bond Amounts. As soon as practicable but in no event less than 10 calendar days prior to the Exchange Date, the Closing Agent shall calculate the Escrowed Bond Amount for each relevant Series for such date. The Escrowed Bond Amount for the Discount Series L shall be calculated based on the product (rounded downward to the nearest Minimum Multiple for such Series) for each Purchaser receiving Discount Bonds denominated in U.S. Dollars of (A) 65% of such Purchaser's Unreconciled ED (allocated to Principal Bonds denominated in U.S. Dollars) for the Exchange Date as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Exchange Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b) hereof), multiplied by (B) the percentage of such Purchaser's Unreconciled ED allocable to Discount Bonds (whether Discount Series L or Discount Series U, or both) in accordance with Section 2.07 hereof, and shall be equal to the sum of such products for all such Purchasers. The Escrowed Bond Amount for Par Series L shall be calculated based on the product (rounded downward to the nearest Minimum Multiple for such Series) for each Purchaser receiving Par Bonds denominated in U.S. dollars of (x) 100% of such Purchaser's Unreconciled ED (allocated to Principal Bonds denominated in U.S. Dollars) for the Exchange Date as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Exchange Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b) hereof), multiplied by (y) the percentage of such Purchaser's Eligible Debt allocable to Par bonds (whether Par Series L or Par Series U, or both) in accordance with Section 2.07 hereof, and shall be equal to the sum of such products for all such Purchasers.

The Escrowed Bond Amount for the DMK Discount Series shall be calculated based on the product (rounded downward to the nearest Minimum Multiple for such Series) for each Purchaser receiving Discount Bonds denominated in Deutsche Mark of (A) 65% of such Purchaser's Unreconciled ED (allocated to Principal Bonds denominated in Deutsche Mark) for the Exchange Date as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Exchange Date (as such statements may be modified by such Purchaser pursuant to Section 2.05(b) hereof), multiplied by (B) the percentage of such Purchaser's Unreconciled ED allocable to such Series in accordance with Section 2.07 hereof, and shall be equal to the sum of such products for all such Purchasers. The Escrowed Bond Amount for the DMK Par Series shall be calculated based on the product (rounded

downward to the nearest Minimum Multiple for such Series) for each Purchaser receiving Discount Bonds denominated in Deutsche Mark of (x) 100% of such Purchaser's Unreconciled ED (allocated to Principal Bonds denominated in Deutsche Mark) for the Exchange Date as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Exchange Date (as such statements may be modified by such Purchaser pursuant to Section 2.05(b) hereof), multiplied by (y) the percentage of such Purchaser's Eligible Debt allocable to such Series in accordance with Section 2.07 hereof, and shall be equal to the sum of such products for all such Purchasers.

(b)  The Escrow Release Date.  (i)  Exchange Amount.  As soon as practicable but in no event less than 10 calendar days prior to the Escrow Release Date, the Closing Agent shall calculate each Purchaser's Exchange Amount for each Series for the Escrow Release Date.

(ii)  Discount Bonds.  The aggregate principal amount of each Series of Discount Bonds to be released from the appropriate Escrow Account under Section 2.01(b) hereof to each Purchaser (or, if applicable, its Purchasing Office) shall be equal to the product (rounded downward to the nearest Minimum Multiple for such Series) of (A) 65% of such Purchaser's Reconciled ED for the Escrow Release Date, as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Escrow Release Date (as such statement may be modified by such Purchaser pursuant to Section 2.05(b) hereof), multiplied by (B) the percentage of such Purchaser's Reconciled ED allocable to such Series in accordance with Section 2.07 hereof.

(iii)  Par Bonds.  The aggregate principal amount of each Series of Par Bonds to be released from the appropriate Escrow Account under Section 2.01(b) hereof to each Purchaser (or, if applicable, its Purchasing Office) shall be equal to the product (rounded downward to the nearest Minimum Multiple for such Series) of (A) 100% of such Purchaser's Reconciled ED for the Escrow Release Date, as indicated in the statements sent by the Closing Agent pursuant to Section 2.05(b) hereof for the Escrow Release Date (as such statements may be modified by such Purchaser pursuant to Section 2.05(b) hereof), multiplied by (B) the percentage of such Purchaser's Reconciled ED allocable to such Series in accordance with Section 2.07 hereof.

(iv)  Residual Bond Amounts.  As soon as practicable but in no event less than 10 calendar days prior to the Escrow Release Date, the Closing Agent shall calculate the

46

Residual Bond Amount for each relevant Series.  The Residual
Bond Amount for Discount Series L shall be calculated based
on the product (rounded downward to the nearest Minimum
Multiple for such Series) for each Purchaser receiving
Discount Bonds denominated in U.S. Dollars of (x) 65% of such
Purchaser's Unreconciled ED (allocated to Principal Bonds
denominated in U.S. Dollars) for the Escrow Release Date as
indicated in the statements sent by the Closing Agent
pursuant to Section 2.05(b) hereof for the Escrow Release
Date (as such statements may be modified by such Purchaser
pursuant to Section 2.05(b) hereof), multiplied by (y) 0.35,
and shall be equal to the sum of such products for all such
Purchasers.  The Residual Bond Amount for Par Series L shall
be calculated based on the product (rounded downward to the
nearest Minimum Multiple for such Series) for each Purchaser
receiving Par Bonds denominated in U.S. Dollars of (x) 100%
of such Purchaser's Unreconciled ED (allocated to Principal
Bonds denominated in U.S. Dollars) for the Escrow Release
Date as indicated in the statements sent by the Closing Agent
pursuant to Section 2.05(b) hereof for the Escrow Release
Date (as such statements may be modified by such Purchaser
pursuant to Section 2.05(b) hereof) multiplied by (y) 0.65,
and shall be equal to the sum of such products for all such
Purchasers.

        The Residual Bond Amount for the DMK Discount Series
shall be calculated based on the product (rounded downward to
the nearest Minimum Multiple for such Series) for each
Purchaser receiving Discount Bonds denominated in Deutsche
Mark of (A) 65% of such Purchaser's Unreconciled ED
(allocated to Principal Bonds denominated in Deutsche Mark)
for the Escrow Release Date as indicated in the statements
sent by the Closing Agent pursuant to Section 2.05(b) hereof
for the Escrow Release Date (as such statements may be
modified by such Purchaser pursuant to Section 2.05(b)
hereof), multiplied by (B) 0.35, and shall be equal to the
sum of such products for all such Purchasers.  The Residual
Bond Amount for the DMK Par Series shall be calculated based
on the product (rounded downward to the nearest Minimum
Multiple for such Series) for each Purchaser receiving Par
Bonds denominated in Deutsche Mark of (x) 100% of such
Purchaser's Unreconciled ED (allocated to Principal Bonds
denominated in Deutsche Mark) for the Escrow Release Date, as
indicated in the statements sent by the Closing Agent
pursuant to Section 2.05(b) hereof for the Escrow Release
Date (as such statements may be modified by such Purchaser
pursuant to Section 2.05(b) hereof), multiplied by (y) 0.65,
and shall be equal to the sum of such products for all such
Purchasers.

        (c)  For purposes of calculating the Escrowed Bond
Amounts and Residual Bond Amounts under subsections
2.06(a)(iv) and (b)(iv) above and for purposes of the

· 47

definition of Unreconciled ED, the following rules shall apply:

(i)  except as provided in clauses (ii) and (iii) below, if, prior to the Exchange Date or the Escrow Release Date, as the case may be, the amount of any item of Eligible Debt, or any portion thereof, claimed by any Purchaser has not been included in the Reconciled ED of such Purchaser, such item of Eligible Debt, or portion thereof, shall constitute Unreconciled ED in an amount for such Purchaser equal to the amount of such item or portion thereof claimed by such Purchaser;

(ii)  in the event that an item of Eligible Debt, or any portion thereof, is claimed by more than one Purchaser, the amount of such item of Eligible Debt, or any portion thereof, shall, subject to clause (iii) below, be included only in the Unreconciled ED of the Recognized Holder thereof and shall not be included in the Unreconciled ED of any other Purchaser; and

(iii)  no item of Eligible Debt, or any portion thereof, that has been cancelled in connection with a privatization or other debt conversion as evidenced by a writing addressed to Argentina, any Obligor or a Debt Agreement Agent and executed by the holder of record of such item of Eligible Debt, or portion thereof, on the date of such cancellation shall be included in the Unreconciled ED claimed by any Purchaser.

SECTION 2.07.  Percentage Allocations Among Par Bonds and Discount Bonds; Adjustment of Percentage Allocations.  (a)  Part I of Schedule A hereto sets forth for each Purchaser the percentage of such Purchaser's aggregate Eligible Debt (expressed in a Principal Bond Currency) which is to be exchanged for Par Bonds and Discount Bonds.  The percentage allocation for each Purchaser reflected on Part I of Schedule A hereto shall be as follows:

(i)  subject to subsection (b) below, Purchasers executing this Agreement on or prior to December 30, 1992 shall have a percentage allocation in respect of Eligible Debt (expressed in a Principal Bond Currency) of 65% committed to be exchanged for Par Bonds and 35% committed to be exchanged for Discount Bonds, unless (A) such Purchaser has requested a percentage allocation which provides for the exchange of more than 35% of its Eligible Debt for Discount Bonds, in which case such Purchaser's percentage allocation shall be as requested

48

by such Purchaser or (B) such Purchaser is a member of an
Affiliated Committing Group and such Purchaser has
requested a percentage allocation which, when aggregated
with the percentage allocations of all Purchasers in such
Affiliated Committing Group, provides for the exchange of
35% of such Affiliated Committing Group's Eligible Debt
for Discount Bonds, in which case such Purchaser's
percentage allocation shall be as requested by such
Purchaser; and

(ii) Purchasers executing this Agreement after
December 30, 1992 shall have a percentage allocation in
respect of Eligible Debt (expressed in a Principal Bond
Currency) of 65% committed to be exchanged for Par Bonds
and 35% committed to be exchanged for Discount Bonds.

(b) For each Principal Bond Currency, in the event
that the percentage of the USD Equivalent or the DMK
Equivalent, as appropriate, of the Eligible Debt of all
Purchasers who have executed this Agreement on or prior to
December 30, 1992 to be exchanged for Discount Bonds in such
Principal Bond Currency (based on the percentage allocations
referred to in subsection (a)(i) above) exceeds the Minimum
Discount Level for such Principal Bond Currency, the
percentage allocations of all such Purchasers that indicated
a preference for an allocation which provides for the
exchange of less than 35% of their Eligible Debt for Discount
Bonds will be adjusted as soon as practicable after the
Translation Rate Determination Date by lowering each such
Purchaser's percentage allocation of Eligible Debt (expressed
in such Principal Bond Currency) to Discount Bonds to the
lowest level at which the Minimum Discount Level for such
Principal Bond Currency is still achieved. Promptly
following any such adjustment, the Closing Agent will notify
each Purchaser whose percentage allocation has been so
adjusted of its adjusted percentage allocation.

SECTION 2.08.  Currency Conversion and Translation.
(a)  In order to facilitate the issuance of Principal Bonds
denominated in U.S. Dollars in exchange for any item of
Eligible Debt denominated in a currency other than U.S.
Dollars, such Eligible Debt shall be converted into U.S.
Dollars on an initial Conversion Date or Supplementary
Conversion Date in accordance with Schedule B hereto.

(b)  If the Exchange Date for any reason does not
occur on or prior to the Termination Date (as it may be
extended under Section 6.09(a)), Argentina agrees that,
within three months after such Termination Date, a mechanism

49

will be established, with respect to any item of Eligible
Debt converted into U.S. Dollars from an Original Currency,
to permit, at the option of the holder of such item of
Eligible Debt (provided such holder was the holder at the
time such item of Eligible Debt was so converted), the
conversion of such item of Eligible Debt into the Original
Currency and with the same interest rate basis in which such
item of Eligible Debt was denominated before giving effect to
such conversions.

(c) The principal amount of Principal Bonds of each
Series to be issued in exchange for each item of Eligible
Debt denominated in an Original Currency other than U.S.
Dollars and Deutsche Mark which has not been converted into
Eligible Debt denominated in a Principal Bond Currency
pursuant to subparagraph (a) above will be determined in
accordance with the translation procedures contained in
Schedule B hereto.

(d) If an Exchange Date is delayed beyond the date
originally notified to Purchasers pursuant to Section 2.05(a)
as the date scheduled for the Exchange Date, as a result of
any failure to fulfill, on or before the anticipated Exchange
Date, any condition to be performed by Argentina or as a
direct or indirect result of any action or inaction by
Argentina, unless by the close of business in New York City
on the fifth Business Day prior to such anticipated Exchange
Date Argentina notifies such Purchasers that the scheduled
Exchange Date has been postponed to a later date in
accordance with Section 2.05(a) hereof, Argentina shall
indemnify any Purchaser which has committed to exchange its
Eligible Debt denominated in an Original Currency other than
U.S. Dollars or Deutsche Mark pursuant to the currency
translation procedures specified in Part III of Schedule B
hereto for Principal Bonds denominated in U.S. Dollars or
Deutsche Marks for any loss reasonably incurred by such
Purchaser as the result of the failure of the Exchange Date
to occur on any date notified to the Purchasers pursuant to
Section 2.05(a) hereof, _provided_ that such Purchaser submits
appropriate evidence of such loss. Notwithstanding the
foregoing, Argentina shall not be required to indemnify any
Purchaser under this Section 2.08(d) if, after submitting its
Commitment Telex, such Purchaser was required to effect
conversions of its Eligible Debt in accordance with the
provisions of Parts I and II of Schedule B hereto and failed
to make such conversions in accordance with such provisions.

SECTION 2.09.  Form and Denomination of Principal
Bonds.  The Principal Bonds shall be issued in the form and

50

denominations specified in the Fiscal Agency Agreement and shall be transferable and exchangeable into new Principal Bonds of the same Series, subject to the restrictions set forth in the Principal Bonds and in the Fiscal Agency Agreement.

SECTION 2.10.  Allocation of Collateral Among Series of Principal Bonds.  (a)  As soon as practicable after the Translation Rate Determination Date, the Closing Agent, in consultation with Argentina, shall calculate, and notify Argentina of, the aggregate principal amount of Principal Bonds of each Series (including Escrowed Principal Bonds) to be issued on the Exchange Date.  Upon notification by the Closing Agent of each such aggregate principal amounts, which notification shall be made no later than 10 calendar days prior to the Exchange Date, Argentina shall calculate the Principal Collateral Amount and the Interest Collateral Amount for each Series of Principal Bonds in accordance with Schedule C hereto and the Closing Agent shall confirm such Principal Collateral Amounts and Interest Collateral Amounts.  The Closing Agent and Argentina shall jointly notify the Collateral Agent of the Principal Collateral Amount and the Interest Collateral Amount for each Series of Principal Bonds not later than three calendar days before the Exchange Date.

(b)  On or prior to the tenth Business Day prior to the Escrow Release Date, the Closing Agent in consultation with Argentina shall calculate, and notify Argentina of, the aggregate principal amount of Principal Bonds of each Series that will be outstanding on the Escrow Release Date after giving effect to the adjustments to the Global Principal Bonds in accordance with the instructions to be delivered pursuant to Section 3.05(c) hereof.  Upon notification by the Closing Agent, Argentina shall calculate the Principal Collateral Amount and the Interest Collateral Amount for each Series of Principal Bonds in accordance with Schedule C hereto and the Closing Agent shall confirm such Principal Collateral Amounts and Interest Collateral Amounts.  The Closing Agent and Argentina shall jointly notify the Collateral Agent of the Principal Collateral Amount and the Interest Collateral Amount for each Series of Principal Bonds not later than five Business Days before the Escrow Release Date.

SECTION 2.11.  Funding Indemnity.  (a)  Argentina shall indemnify each Purchaser in the appropriate currency, against any loss or expense reasonably incurred by such Purchaser as a result of the failure of the Exchange Date to

occur on the date notified by the Closing Agent under Section 2.05(a) hereof as a result of any failure to fulfill on or prior to such date any condition to be fulfilled by Argentina or as a direct or indirect result of any action or inaction by Argentina, unless by the close of business in New York City on the fifth Business Day before the anticipated Exchange Date, Argentina notifies such Purchasers that such date has been postponed to a later date in accordance with Section 2.05(a) hereof, including, without limitation, any loss (excluding loss of anticipated profits) or expense incurred by reason of the liquidation or reemployment of deposits or other funds by any Purchaser in connection with the purchase of a Principal Bond to be purchased by such Purchaser as part of the Exchange when such Principal Bond, as a result of such failure, is not purchased on such date.

(b)  Argentina shall also indemnify each Purchaser in the appropriate currency, against any loss (excluding loss of anticipated profits) or expense reasonably incurred by any Purchaser by reason of the liquidation or reemployment of deposits or other funds acquired by such Purchaser to fund or maintain all or any part of such Purchaser's Eligible Debt which bears a fixed rate of interest or other rate based upon the long-term costs of funds; provided, however that Argentina shall not be required to indemnify a Purchaser for any such loss or expense arising from the funding or maintenance of any such item of Eligible Debt after the Reset Date (as defined below) if the interest rate for such item of Eligible Debt was scheduled to be reset on a date (the "Reset Date") occurring after June 28, 1992 and such interest rate was not fixed on the Reset Date at the applicable rates and for the periods specified in Part IV of the 1992 Financing Plan.

(c)  Nothing in this Section 2.11 shall affect the right of any Purchaser to seek indemnification pursuant to Section 2.08 hereof.  Any demand made by a Purchaser under subsections (a) and (b) of this Section 2.11 shall be accompanied by a reasonably detailed certificate of such Purchaser as to the amount of such compensation and the basis on which it was computed.

52

## ARTICLE III

## RESTRICTIONS ON TRANSFER; GLOBAL
## PRINCIPAL BONDS; ESCROW ACCOUNT

SECTION 3.01.  General Restrictions on Transfer, Etc.

(a) Each Purchaser acknowledges that the Principal Bonds have not been and will not be registered under the Securities Act.

(b) Each Purchaser which indicates on Schedule A hereto that it is a U.S. Person and each Non-U.S. Person that elects on such Schedule A to receive Principal Bonds pursuant to Section 4(2) of the Securities Act agrees that, for a two-year period after the Exchange Date, it will not offer or sell such Principal Bonds except as follows:

(i) pursuant to an effective registration statement under the Securities Act;

(ii) to an Eligible Institutional Investor upon delivery to the Registrar of a transferor's certificate substantially in the form of Schedule A-1 to the Fiscal Agency Agreement and a transferee's certificate substantially in the form of Schedule A-2 to the Fiscal Agency Agreement;

(iii) pursuant to Rule 904 of Regulation S upon delivery to the Registrar of a transferor's certificate substantially in the form of Schedule B to the Fiscal Agency Agreement; and

(iv) to a QIB pursuant to Rule 144A under the Securities Act upon delivery to the Registrar of a transferor's certificate substantially in the form of Schedule C to the Fiscal Agency Agreement.

(c) Each Purchaser acknowledges and agrees that DMK Discount Series Bonds and DMK Par Series Bonds will not be issued to U.S. Purchasers.

SECTION 3.02.  Issuance of Bonds on the Exchange Date.  (a)  Global Bonds for U.S. Offering.  The Principal Bonds denominated in U.S. Dollars of each Series to be issued on the Exchange Date to Purchasers indicated on Schedule A hereto as being U.S. Persons or Non-U.S. Persons electing on such Schedule A to receive Principal Bonds pursuant to

Section 4(2) of the Securities Act shall be in registered form and evidenced by a U.S. Global Principal Bond for such Series. The Fiscal Agent shall exchange the beneficial interest of each holder in the U.S. Global Principal Bond for such Series for Principal Bonds of such Series in definitive form in accordance with the provisions of the Fiscal Agency Agreement.

(b) <u>Global Bonds for Non-U.S Offering</u>. The Principal Bonds denominated in U.S. Dollars of each Series to be issued on the Exchange Date to Purchasers indicated on Schedule A hereto as being Non-U.S. Persons (other than those electing on Schedule A hereto to receive Bonds pursuant to Section 4(2) of the Securities Act) shall be in registered form and evidenced by a Non-U.S. Global Principal Bond. A holder of a beneficial interest in a Non-U.S. Global Principal Bond of a Series may exchange all or part of such beneficial interest for definitive Principal Bonds of such Series in accordance with the provisions of the Fiscal Agency Agreement.

(c) <u>Global Bonds in Escrow Account</u>. The Principal Bonds denominated in U.S. Dollars to be issued on the Exchange Date to the Escrow Agent in accordance with Section 2.01(a) hereof, shall be in registered form and evidenced by a U.S. Temporary Escrow Global Discount Bond and a U.S. Temporary Escrow Global Par Bond, and shall be issued in the name of and delivered to the Escrow Agent.

Section 3.03. <u>Release of Principal Bonds on the Escrow Release Date</u>. The Bond Exchange Amount for any Series of Principal Bonds denominated in U.S. Dollars to be released on the Escrow Release Date pursuant to Section 3.05(d)(i) hereof shall be evidenced as follows:

(a) Principal Bonds of such Series to be received by a Purchaser indicated on Schedule A hereto as being a U.S. Person or a Non-U.S. Person electing to receive Floating Rate Bonds pursuant to Section 4(2) of the Securities Act shall be in registered form and evidenced by the U.S. Global Principal Bond for such Series; and

(b) Principal Bonds of such Series to be received by a Purchaser indicated on Schedule A hereto to be a Non-U.S. Person (other than those electing to receive Principal Bonds pursuant to Section 4(2) of the Securities Act) shall be in registered form and evidenced by the Non-U.S. Global Principal Bond for such Series.

54

SECTION 3.04.  <u>Global Principal Bonds for DMK</u>
<u>Bonds</u>.  Principal Bonds denominated in Deutsche Mark shall be
issued to those Purchasers that elect on Schedule A hereto to
receive DMK Bonds, meet the requirements specified in the
introduction to Schedule B hereto and indicate on Schedule A
hereto that they are Non-U.S. Persons and Non-U.S.
Purchasers.  Each Series of DMK Bonds will be issued in
bearer form in denominations of DMK 5,000 each.  Each Series
of DMK Bonds will be represented by one or more Global
Principal Bonds in bearer form (the "<u>DMK Global Bearer</u>
<u>Bonds</u>") without interest coupons.  Upon the initial
redemption of a Class or Classes (as defined in the
Conditions) of a Series of DMK Bonds, such DMK Global Bearer
Bond(s) for such Series will be exchanged for separate DMK
Global Bearer Bond(s) of such Series each representing a
Class of such Series of DMK Bonds.  The holders of either
Series of DMK Bonds may not require Argentina to issue
definitive bonds or interest coupons in respect of the DMK
Global Bearer Bonds.  The DMK Global Bearer Bonds shall be
deposited with the German Clearing System and the DMK Bonds
represented by such DMK Global Bearer Bonds shall be
transferable as co-ownership participations in the DMK Global
Bearer Bonds in accordance with the applicable rules of the
German Clearing System.  However, no Principal Bonds
denominated in Deutsche Mark shall be issued on behalf of any
Purchaser that has notified Argentina pursuant to
Section 4.02(o) hereof that the representations in such
Section 4.02(o) are untrue at any time on or prior to the
Exchange Date.

SECTION 3.05.  <u>Escrow Account</u>.  (a)  <u>Establishment</u>
<u>of Escrow Account</u>.  Prior to the Exchange Date, the Closing
Agent shall instruct the Escrow Agent to establish escrow
accounts (the "<u>Escrow Accounts</u>") pursuant to the Escrow
Agreement into which Principal Bonds issued pursuant to
Section 2.01(a)(ii) and interest payments, if any, relating
to such Escrowed Principal Bonds will be deposited.  Such
Escrow Accounts will be established at such commercial bank
or trust company or official bank or financial institution
appointed by the Closing Agent and shall be subject to the
terms and conditions of the Escrow Agreement.  The Principal
Bonds to be issued pursuant to Section 2.01(a)(ii) hereof on
the Exchange Date shall be issued in the name of the Escrow
Agent (or, in the case of Principal Bonds denominated in
Deutsche Mark, credited to the account of a bank or financial
institution selected by the Escrow Agent at the German
Clearing System) for credit to an Escrow Account and shall be
held by or for the account of the Escrow Agent in an Escrow

55

Account subject to the written instructions of the Closing Agent as provided in this Section 3.04 and in the Escrow Agreement. The Principal Bonds held in the Escrow Accounts shall be held by the Escrow Agent, in escrow and in trust for the benefit of the Purchasers. Argentina shall have no interest in the Principal Bonds held in the Escrow Accounts.

(b) Rejection of Offer to Exchange. If any item of Eligible Debt or any portion thereof has not been reconciled hereunder because it is disputed by Argentina and has not been agreed to by Argentina on or prior to the Reconciliation Cut-Off Date for the Escrow Release Date, the Purchaser claiming such item of Eligible Debt, or any portion thereof, may, upon notice to the Closing Agent given after the Reconciliation Cut-Off Date for the Escrow Release Date but not less than 15 calendar days before the Escrow Release Date, consider, as of the Escrow Release Date, (i) its tender of such item of Eligible Debt for the Exchange to be rejected by Argentina and (ii) its agreement to exchange such item of Eligible Debt pursuant to this Agreement to be terminated. In such event, as of the Escrow Release Date, (w) such item of Eligible Debt, or portion thereof, shall be excluded from such Purchaser's Unreconciled ED, (x) such Purchaser shall be deemed to have relinquished its rights under this Agreement and its rights to any Escrowed Principal Bonds issued in respect of such item of Eligible Debt or any portion thereof, (y) such Purchaser shall have all rights with respect to such item of Unreconciled ED, or any portion thereof including, without limitation, the right to exercise or assert any right or claim with respect to such item of Unreconciled ED or portion thereof and (z) if such item of Eligible Debt or any portion thereof is evidenced by a Promissory Note, the Promissory Note Agent shall return such Promissory Note to such Purchaser by the Escrow Release Date. Notwithstanding the foregoing, a Purchaser may not consider its tender to be so rejected or its agreement to be so terminated with respect to any item of its Unreconciled ED if all or a portion of such item is claimed by one or more other Purchasers and such other Purchasers have not consented in writing to the delivery of the notice set forth above.

(c) Adjustment of Global Principal Bonds. On the Escrow Release Date with respect to each Series of Principal Bonds:

(i) the Closing Agent and Argentina shall instruct the Fiscal Agent to instruct the Registrar or the Common Depositary, as the case may be, to endorse the Schedule to each Global Principal Bond (other than the U.S.

56

Temporary Escrow Global Principal Bonds and the DMK
Global Bearer Bonds) for such Series to increase the
principal amount of such Global Principal Bond by an
amount equal to the aggregate of each Purchaser's
Exchange Amount for the Escrow Release Date for such
Series to be evidenced by such Global Principal Bond as
provided in Sections 3.03(a) and 3.03(b) hereof;

(ii) (x) the Closing Agent and Argentina shall
instruct the Fiscal Agent to endorse and (y) the Closing
Agent shall instruct the Escrow Agent to make the U.S.
Temporary Escrow Global Principal Bonds available at the
office of the Escrow Agent for such endorsement of, the
Schedule to the U.S. Temporary Escrow Global Principal
Bond for such Series, if any, to decrease the aggregate
principal amount of Escrowed Principal Bonds represented
thereby to an amount equal to the Residual Bond Amount
for such Series;

(iii) in the case of the DMK Global Bearer Bonds for
such Series, if the aggregate of each Purchaser's
Exchange Amount for the Escrow Release Date for such
Series is greater than the Escrowed Bond Amount for such
Series, Argentina shall issue a separate DMK Global
Bearer Bond for the DMK Discount Series or the DMK Par
Series, as the case may be, in the principal amount of
such difference pursuant to the further issue clause in
Section 12 of the Conditions of the DMK Bonds and deposit
such DMK Global Bearer Bond with the German Clearing
System on the Escrow Release Date; and

(iv) in the case of the DMK Global Bearer Bonds for
such Series, if the aggregate of each Purchaser's
Exchange Amount for the Escrow Release Date for such
Series is less than the Escrowed Bond Amount for such
Series, Argentina shall instruct the Principal Paying
Agent to cancel the DMK Global Bearer Bonds by the amount
of such difference by decreasing the principal amount of
each Class of the DMK Discount Series or the DMK Par
Series, as the case may be, by an equal portion of the
aggregate amount of such difference (such aggregate
amount to be equal to the product of the number of
Classes outstanding and DMK 5,000, or a multiple thereof)
on the Escrow Release Date.

(d) Release of Principal Bonds on the Escrow
Release Date. (i) On the Escrow Release Date and following
the adjustments to the Global Principal Bonds pursuant to

57

Section 3.05(c) hereof, the Closing Agent shall instruct the Fiscal Agent to release, or cause to be released, to each Purchaser's Purchasing Office Principal Bonds in an aggregate principal amount for each Series equal to such Purchaser's Exchange Amount for such Series for the Escrow Release Date.

(ii) On the Escrow Release Date and following the adjustment to the Global Principal Bonds under Section 3.05(c) hereof and the release of Principal Bonds pursuant to subsection (d)(i) above, the Closing Agent shall take such actions as are necessary or appropriate in connection with the commencement of one or more interpleaders with respect to the Principal Bonds remaining in the Escrow Accounts, if any, in accordance with Section 3.05(h) and shall instruct the Escrow Agent to hold or to pay over cash, if any, or deliver Principal Bonds to such places as may be necessary to implement such interpleader. Each party hereto involved in any such interpleader agrees to the matters set forth in Section 3.05(h) hereof and, except as provided in such Section, to reimburse the Escrow Agent and the Closing Agent for such party's allocable share of all costs and expenses (including reasonable fees and expenses of counsel) incurred by the Escrow Agent and the Closing Agent in connection with any such interpleader.

(iii) Notwithstanding anything in this Agreement to the contrary, Principal Bonds denominated in Deutsche Mark and any cash in respect of such Bonds held in the Escrow Accounts shall not be released to any Purchaser that has notified Argentina pursuant to Section 4.02(o) that the representations in such Section 4.02(o) are untrue at any time on or prior to the Escrow Release Date for such Principal Bonds.

(e)  Duties of the Closing Agent and the Escrow Agent. The duties of the Closing Agent with respect to the Principal Bonds, cash or other property held hereunder or in any Escrow Account shall be limited to those set forth in this Section 3.05 and in Article V. Notwithstanding anything in this Agreement to the contrary, the duties, obligations and immunities of the Escrow Agent with respect to the Principal Bonds, cash or other property held hereunder or in any Escrow Account, the Purchasers, the Closing Agent, the Debt Agreement Agents and all other Persons shall be limited to those as are set forth in the Escrow Agreement.

58

(f) <u>Records</u>. The Closing Agent shall keep a record of all Escrowed Principal Bonds deposited in the Escrow Accounts which, absent manifest error, shall be controlling at all times with respect to the Purchasers and Argentina.

(g) <u>Authorizations and Payments</u>. To the extent that Section 3.05(d) above provides that the Closing Agent shall instruct the Escrow Agent to release Escrowed Principal Bonds from the Escrow Accounts or the Fiscal Agent to release Principal Bonds, Argentina hereby expressly and irrevocably authorizes the Closing Agent to give such instructions and hereby expressly and irrevocably authorizes the Escrow Agent and the Fiscal Agent to act on any such instructions; <u>provided, however</u>, that under no circumstances shall the Closing Agent be obligated to take any such action in the event that any Escrowed Principal Bonds or any Eligible Debt to which any such Escrowed Principal Bonds relates is in dispute. Under the circumstances described in the proviso to the preceding sentence or at any other time that the Closing Agent determines in its reasonable judgment that it is appropriate to do so, the Closing Agent may take such actions as are necessary or appropriate in connection with the commencement (in accordance with Section 3.05(h) hereof) of one or more interpleaders with respect to any Principal Bonds held in the Escrow Accounts. Each party involved in any such interpleader agrees to the matters set forth in Section 3.05(h) hereof. Each Purchaser hereby authorizes the Closing Agent and the Escrow Agent to take any action necessary or appropriate to commence any such interpleader.

(h) <u>Certain Matters Relating to Interpleader Actions</u>. (x) In the event that, in accordance with Section 3.05(d)(ii) or Section 3.05(g) hereof, one or more interpleaders have been commenced with respect to Escrowed Principal Bonds denominated in U.S. Dollars or cash, each party hereto, to the extent it becomes a party to any such interpleader, hereby:

(i) irrevocably submits to the exclusive jurisdiction of any New York State or Federal court sitting in New York City (and any appellate court for any appeal thereof) for any suit, action or proceeding in the nature of interpleader arising out of or relating to the claim of such party to any Escrowed Principal Bonds, cash or any portion thereof; <u>provided, however</u>, that with respect to any such suit, action or proceeding, Argentina irrevocably submits only to the exclusive jurisdiction of the United States District Court for the Southern District of New York and any appellate court for any appeal thereof, such that (a) any interpleader to which

59

Argentina is a party upon the initiation of such
interpleader shall be commenced and, for so long as
Argentina is a party, shall be litigated exclusively in
the United States District Court for the Southern
District of New York and any appellate court therefrom
and (b) any interpleader pending in a court other than
the United States District Court for the Southern
District of New York to which Argentina becomes a party
after the commencement of such interpleader shall be
transferred or refiled, and litigated exclusively in the
United States District Court for the Southern District of
New York and any appellate court for any appeal thereof;

(ii) irrevocably waives any defense or objection to
interpleader on the grounds of personal jurisdiction,
venue, inconvenient forum, residence, domicile or
sovereign (or other) immunity as to itself and any
Principal Bonds, any cash or any portion thereof subject
to such interpleader in which such party claims an
interest;

(iii) irrevocably consents to service of any and all
process in any interpleader action by mailing copies of
such process to such party at its address as specified in
Section 6.02 hereof; provided, however, that nothing in
this subsection shall affect the right of any party to
the interpleader to serve legal process in any other
manner permitted by law;

(iv) agrees to proceed with diligence and to take
all reasonable steps to expedite the adjudication of such
interpleader to the extent permitted by law and by the
court in which such matter is pending, including without
limitation (A) consolidation of such interpleader, (B)
adjudication of related matters by one judge, to the
extent permitted by applicable rules, (C) expedited
pleadings, (D) expedited motion practice, (E) expedited
discovery, (F) expedited trial, (G) expedited entry of
judgment and (H) expedited appeal from such judgment;

(v) agrees that if Argentina, the Escrow Agent or
the Closing Agent is named a party to such interpleader
and advises such court that it renounces any claims to
the cash or Principal Bonds in question, and an
adjudication is sought only as to the proper recipient of
such cash or Principal Bonds, consents to the dismissal
of Argentina, the Escrow Agent or the Closing Agent, as
the case may be, from such interpleader and agrees not to
seek reversal of such dismissal or to reintroduce

Argentina, the Escrow Agent or the Closing Agent, as the case may be, as a party to such interpleader and agrees that, in the case of a dismissal of Argentina, Argentina shall not be responsible for any portion of the expenses of the Escrow Agent or the Closing Agent in connection with such interpleader;

(vi)   waives, to the extent it may effectively do so, the right to a jury trial in connection with such interpleader or any claim or defense in such interpleader;

(vii)   waives, and agrees not to exercise or assert, any right or claim against Argentina or any Obligor (except in connection with such interpleader) with respect to an item of Eligible Debt, or any portion thereof, in respect of which Principal Bonds or cash have been deposited with such court pursuant to such interpleader for so long as such Principal Bonds or cash remain subject to such interpleader;

(viii)   agrees and covenants not to institute, prosecute, aid or permit to be prosecuted, any claim, demand, action, suit or proceeding of any kind that party has or may have against Argentina, the Closing Agent or the Escrow Agent arising from, by reason of or relating to the claims of such party to any Principal Bonds, cash or portion relating thereto subject to such interpleader;

(ix)   agrees that, in the event that any Purchaser is determined by the final order of a court which is no longer subject to appeal or certiorari proceeding to be entitled to, or all of the parties to any such interpleader agree in writing that any Purchaser is entitled to, be treated as the Recognized Holder of an item of Eligible Debt, or any portion thereof, as to which Escrowed Principal Bonds denominated in U.S. Dollars subject to such interpleader were issued, such Purchaser shall receive Principal Bonds of Discount Series L in an aggregate principal amount equal to the product of (A) 35% of the amount of such item of Eligible Debt, or portion thereof, multiplied by (B) 0.65 and Principal Bonds of Par Series L in an aggregate principal amount equal to 65% of the amount of such item of Eligible Debt, or portion thereof, in each case in accordance with the USD Fiscal Agency Agreement;

(x)   agrees that all payments made in respect of any Principal Bond denominated in U.S. Dollars that is subject to any such interpleader shall be made to an Escrow Account (located outside the United States) in

61

accordance with the USD Fiscal Agency Agreement, and that any such payments shall be released from such Escrow Account only in accordance with such Fiscal Agency Agreement;

(xi)   agrees that, in the event that it is determined by the final order of a court which is no longer subject to appeal or certiorari proceeding that no Purchaser party to such interpleader is entitled to, or all of the parties to any such interpleader agree in writing that no Purchaser party to such interpleader is entitled to, be treated as the Recognized Holder of an item of Eligible Debt, or any portion thereof, as to which Escrowed Principal Bonds denominated in U.S. Dollars subject to such interpleader were issued, Principal Bonds of Discount Series L in an aggregate principal amount equal to the product of (A) 35% of the amount of such item of Eligible Debt, or portion thereof, multiplied by (B) 0.65 and Principal Bonds of Par Series L in an aggregate principal amount equal to 65% of the amount of such item of Eligible Debt, or portion thereof, shall be cancelled, in each case, in accordance with the USD Fiscal Agency Agreement;

(xii)   agrees that beneficial interests in the U.S. Temporary Escrow Global Principal Bonds will not be exchanged for definitive Principal Bonds unless the use of definitive Principal Bonds is necessary to obtain jurisdiction over Persons other than the Purchaser claiming an interest in such Principal Bonds; and

(xiii)   agrees that upon any determination referred to in clause (ix) or (xi) above, each party to such interpleader agrees promptly to notify Argentina, the Closing Agent, the Fiscal Agent and the Escrow Agent of such determination.

(y)   If in the opinion of the Closing Agent it is necessary or advisable to develop procedures to administer interpleader actions with respect to Principal Bonds denominated in Deutsche Mark, Argentina and the Closing Agent hereby agree to develop procedures substantially similar to those set forth above in this Section 3.05(h) relating to Principal Bonds denominated in U.S. Dollars, to make such adjustments to the DMK Fiscal Agency Agreement as are necessary to implement such procedures and to notify all Purchasers of DMK Bonds thereof prior to the Exchange Date. If any such procedures are developed, each party hereto agrees to abide by such procedures in connection with any interpleader commenced with respect to Principal Bonds denominated in Deutsche Mark.

62

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.  Representations and Warranties of Argentina.  Argentina represents and warrants that:

(a)  Power and Authority.  Argentina has full power, authority and legal right to execute and deliver this Agreement and each of the other Principal Bond Agreements to which it is a party, to incur the obligations to be incurred by it as provided herein and therein and to perform and observe the provisions hereof and thereof on its part to be performed or observed.

(b)  Due Authorization, Etc.  The execution, delivery and performance by Argentina and BCRA of this Agreement and each of the other Principal Bond Agreements to which Argentina and BCRA is a party and all other documents and instruments to be executed and delivered hereunder and thereunder by Argentina and BCRA have been duly authorized by all necessary legislative, executive, administrative and other governmental action, and do not contravene (i) the Constitution of Argentina, or any treaty, law, decree, regulation, judgment, award, injunction or similar legal restriction or (ii) any contractual restriction binding on or affecting Argentina, any Obligor or any of their respective property.  The Principal Bond Agreements comply with the provisions of Decree No. 2006/92.

(c)  No Additional Authorization Required.  No authorization or approval or other action by, and no notice to or filing with, any governmental, legislative or judicial authority or regulatory body is required for the due execution, delivery and performance by Argentina of this Agreement and each of the other Principal Bond Agreements, except for the Argentine Authorizations identified in the certificate furnished pursuant to Section 2.03(b)(i) hereof, all of which are in full force and effect.

(d)  Legal Effect.  This Agreement has been duly executed and delivered by Argentina.  This Agreement is, and on the Exchange Date and the Escrow Release Date each other Principal Bond Agreement (in the case of the Principal Bonds after execution and due authentication and delivery and, in the case of the Global Principal Bonds, the endorsement of the schedules thereto in

63

accordance with the applicable Fiscal Agency Agreement)
will be, the legal, valid and binding obligation of
Argentina enforceable against Argentina in accordance
with its terms.  On the Exchange Date, the Principal
Bonds to be issued by Argentina on such date will have
been duly executed by Argentina.  On the Escrow Release
Date, the DMK Bonds to be issued by Argentina, if any, on
such date will have been duly executed by Argentina.

(e)  Direct Obligation, Etc.  This Agreement, each
other Principal Bond Agreement and each payment
obligation of Argentina hereunder or thereunder is a
direct, unconditional and general obligation of Argentina.

(f)  Pari Passu.  The payment obligations of
Argentina under this Agreement and each other Principal
Bond Agreement when executed and delivered hereunder will
rank at least pari passu in priority of payment (i) with
all other Indebtedness of Argentina which, by its terms,
is payable or, at the option of the holder thereof, may
be payable, in a currency other than Pesos and (ii) with
all obligations of Argentina with respect to any
Indebtedness issued by a Designated Argentine
Governmental Agency which, by its terms, is payable or,
at the option of the holder thereof, may be payable in a
currency other than Pesos.

(g)  No Actions or Proceedings.  There is no pending
or, to the best of the knowledge of Argentina, threatened
action or proceeding affecting Argentina, any Obligor or
any of its properties or their properties before any
court, governmental agency or arbitrator, which,
individually or in the aggregate, (i) could reasonably be
expected to affect materially and adversely the financial
condition of Argentina, or (ii) which purports to affect
the legality, validity, enforceability or performance of
this Agreement or any other Principal Bond Agreement.

(h)  No Immunities, Etc.  Argentina is subject to
civil and commercial law with respect to its obligations
under this Agreement and the other Principal Bond
Agreements, and the execution, delivery and performance
of this Agreement and the other Principal Bond Agreements
by Argentina constitute private and commercial acts (jure
gestionis acts) rather than public or governmental acts
(jure imperii acts).  Under the laws of Argentina,
neither Argentina nor any of its property has any
immunity (sovereign or otherwise) from set-off, from
jurisdiction of any court in Argentina or any legal

64

process in any court in Argentina (whether through
service or notice, attachment prior to judgment,
attachment in aid of execution, execution or otherwise),
except for immunity with respect to (x) properties of the
public domain located in the territory of Argentina
included within the provisions of Articles 2337 and 2340
of the Civil Code of Argentina, (y) property owned by
Argentina and located in its territory which is dedicated
to the purpose of an essential public service and (z) the
assets which constitute freely available reserves,
pursuant to Article 6 of the Convertibility Law, the
amount, composition and investment of which will be
reflected on the balance sheet and accounting statement
of BCRA consistently prepared pursuant to Article 5 of
the Convertibility Law. Pursuant to Law 23,982, and Law
3,952 of Argentina, the courts of Argentina in general
may only enter judgments against Argentina that can be
enforced against Argentina pursuant to the terms of such
laws. Any judgment of a court outside Argentina against
Argentina, which satisfies the requirements of Articles
517 through 519 of Law 17,454, as amended by Law 22,434
(National Code of Civil and Commercial Procedures) is
capable of being enforced in the courts of Argentina in
accordance with the laws of Argentina taking into account
the terms of Law 23,982, particularly Article 22 thereof,
and Law 3,952.

(i) IMF; IBRD; IABD. Argentina is a member and
eligible to use the general resources of the IMF. The
right of Argentina to use the Extended Fund Facility has
not been suspended pursuant to the Articles of Agreement
of the IMF or by decision of the Executive Board of the
IMF. Argentina is a member of the IBRD and IADB.

(j) Taxes. There is no income, stamp, excise or
other tax, levy, assessment, impost, deduction, charge or
withholding of any kind imposed by Argentina (or any
political subdivision or taxing authority thereof or
therein or any organization or federation of which
Argentina is at any time a member) either (i) on or by
virtue of the execution, delivery or performance of this
Agreement or any other Principal Bond Agreement or the
BCRA Undertaking (other than a court tax, which on the
date hereof is 3% of the amount so claimed in conformity
with Article 2 of Law 23,898 (published in the Official
Gazette on November 29, 1980) with respect to the
institution of any judicial proceeding to enforce this
Agreement, any other Bond Agreement or the BCRA
Undertaking in the City of Buenos Aires) or (ii) on any

65

payment to be made by Argentina pursuant to this
Agreement or any other Principal Bond Agreement or by the
BCRA pursuant to the BCRA Undertaking other than any such
tax, levy, assessment, impost, deduction, charge or
withholding imposed on, or measured by payments hereunder
or under any other Principal Bond Agreement to (x)
natural persons or legal entities organized in Argentina
or maintaining a permanent establishment in Argentina to
which this Agreement and the other Principal Bond
Agreements and the income therefrom is attributable or
(y) in respect of fees payable to any Debt Agreement
Agent in respect of services performed in Argentina, if
any.

(k)  No Filing.  This Agreement and each of the
other Principal Bond Agreements are in proper legal form
under the laws of Argentina for the enforcement thereof
against Argentina under the laws of Argentina; and to
ensure the legality, validity, enforceability or
admissibility in evidence of this Agreement or any other
Principal Bond Agreement in Argentina, it is not
necessary that this Agreement or any other Principal Bond
Agreement or any other document be filed or recorded with
any court or other authority in Argentina or be notarized
or that any stamp or similar tax be paid on or in respect
of this Agreement or any other Principal Bond Agreement
or any other document to be furnished thereunder (except
for court fees and taxes incurred in connection with
enforcement proceedings).

(l)  Process Agents.  The letters of the Process
Agents and the Alternate Process Agents to be delivered
pursuant to Section 2.03(b) hereof will, on the Exchange
Date, be irrevocably binding on each such Process Agents
and Alternate Process Agents.

(m)  Financial Information.  The information
statement entitled "Republic of Argentina — Economic
Presentation — June 1992" distributed to the
international banking community together with the 1992
Financing Plan was prepared by Argentina in good faith on
the basis of the latest information available to
Argentina at the time; to the best knowledge of
Argentina, such information does not contain any material
misstatement of fact; and the projections contained
therein reflect the good faith judgment of Argentina.

66

(n) <u>No Registration, Etc., Necessary</u>. No registration of the Principal Bonds under the Securities Act and no qualification of an indenture under the Trust Indenture Act of 1939 is required for the offer and sale of the Principal Bonds in the manner contemplated by this Agreement and the other Principal Bond Agreements, and neither Argentina nor any Argentine Governmental Agency, nor any Person acting on its or their behalf has offered or sold or will offer or sell Principal Bonds or any similar securities in a manner that would require registration of the Principal Bonds under the Securities Act or qualification of an indenture in respect thereof under the Trust Indenture Act of 1939.

(o) <u>Collateral</u>. On the Exchange Date, the Collateral Agent will have for the benefit of the Purchasers of Principal Bonds, a first priority security interest in the Collateral securing the Principal Bonds as provided in the Collateral Pledge Agreement.

(p) <u>No Directed Selling Efforts or Use of General Solicitation Methods; Offshore Transaction</u>. Neither Argentina nor any Argentine Governmental Agency, nor any Person acting on its or their behalf, has engaged or will engage in any directed selling efforts, or has used or will use any General Solicitation Methods in the United States with respect to the Principal Bonds and, in effecting the Exchange with Non-U.S. Purchasers, it has complied and will comply with the offshore transaction requirement of Rule 903(a) under the Securities Act. Terms used in this Section 4.01(p), and not otherwise defined in this Agreement, have the meanings given to them by Regulation S.

SECTION 4.02. <u>Representations, Warranties and Agreements of the Purchasers</u>. Each Purchaser represents and warrants and agrees to and with each other Purchaser, each member of the Working Committee for Argentina, the Closing Agent and, to the extent that the Eligible Debt of such Purchaser is evidenced by a Debt Agreement, each Debt Agreement Agent party to any such Debt Agreement (and, with respect to the first sentence of subsection (a) below, the second sentence of subsection (b) below and subsections (e) through (o) below, to and with Argentina) as follows:

(a) <u>Independent Investigation by each Purchaser</u>. Such Purchaser is familiar with such matters (including, without limitation, the economic and financial condition of Argentina) as in its opinion may affect (i) its

67

decision to grant the Waiver, to sign the Amendments, this Agreement or any other Principal Bond Agreement and to effect the Exchange and (ii) the performance by Argentina of its obligations under this Agreement or any other Principal Bond Agreement and by BCRA of its obligations under the BCRA Undertaking and in that connection has made its own independent appraisal of the economic affairs, financial condition, foreign exchange and reserve holdings, prospective foreign exchange income and holdings, creditworthiness, condition, affairs, status and nature of Argentina and BCRA and all other factors relevant to its decision to enter into this Agreement. Such Purchaser will continue to be solely responsible for making its own independent appraisal of all such matters in the future and has not relied, and will not hereafter rely, on any other Purchaser or on any member of the Working Committee for Argentina or on the Closing Agent, the Promissory Note Agent or any Debt Agreement Agent or any of their respective Affiliates (A) to check or inquire on such Purchaser's behalf into the adequacy, accuracy or completeness of any information provided by Argentina in connection with this Agreement or any other Principal Bond Agreement or by BCRA in connection with the BCRA Undertaking, whether or not such information has been or is hereafter distributed by any other Purchaser, any member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent or any Debt Agreement Agent or any of their respective Affiliates, (B) to assess or keep under review on such Purchaser's behalf such information or any of the matters referred to in this Section 4.02(a), or (C) to inform such Purchaser concerning the results of any such appraisal, check, inquiry, assessment or review made by such other Purchaser or member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent or any Debt Agreement Agent or any of their respective Affiliates.

(b)  Independent Appraisal by Each Purchaser.  In deciding whether or not to enter into this Agreement and to effect the transaction contemplated hereby, such Purchaser has relied upon its own independent appraisal of the matters referred to in Section 4.02(a) above, and such Purchaser expressly agrees that it is not relying upon (i) any representation or warranty, express or implied, made to it by any other Purchaser, any member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent or any Debt Agreement Agent or any of their respective Affiliates with respect to the

68

matters contemplated herein or (ii) any oral or written
communication made by any other Purchaser, any member of
the Working Committee for Argentina, the Closing Agent,
the Promissory Note Agent or any Debt Agreement Agent or
any of their respective Affiliates.  Without limiting the
generality of the foregoing, each Purchaser acknowledges
that in making its decision to exchange its Eligible Debt
for Principal Bonds and to execute this Agreement
(i) prior to the execution of this Agreement, it reviewed
the terms and conditions of each of the Debt Agreements
to which it is a party and (ii) a copy of this Agreement
and the other Principal Bond Agreements, the 1992
Financing Plan, the Exhibits, Annexes and Schedules
hereto or thereto and the information statement entitled
"Republic of Argentina -- Economic Presentation -- June
1992" have been made available to it and to its
individual legal counsel for review.

     (c)  *Parties Having Other Relationships*.  Such
Purchaser is aware that the Closing Agent, each Debt
Agreement Agent, the Promissory Note Agent, each member
of the Working Committee for Argentina, each other
Purchaser and their respective Affiliates may have, in
addition to this Agreement and any other Principal Bond
Agreement, existing credit relationships with Argentina,
BCRA and other Persons organized under the laws of or
located in Argentina and that in many cases these
existing relationships are substantial and in some cases
involve existing agency or similar responsibilities of
the Closing Agent, Debt Agreement Agents, the Promissory
Note Agent, members of the Working Committee for
Argentina, other Purchasers or their respective
Affiliates.  Such Purchaser acknowledges and accepts that
such other relationships in fact exist and that the
nature and extent of such other relationships have not
been specifically disclosed to such Purchaser and that
each other Purchaser, each member of the Working
Committee for Argentina, the Closing Agent, the
Promissory Note Agent, the Debt Agreement Agent, the
Promissory Note Agents and their respective Affiliates
may also in the future accept deposits from, lend money
to, act as trustee under indentures of, act as agent or
in a similar function under any credit relationship with,
act as lead manager or underwriter for any bond, note or
other security issued by, and generally engage in any
kind of business with, Argentina, BCRA and any other
Person, all as if such other Purchaser, such member of
the Working Committee for Argentina, the Closing Agent,
the Promissory Note Agent or such Debt Agreement Agent

69

were not a party to this Agreement. Such Purchaser acknowledges that each other Purchaser, each member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent and the Debt Agreement Agents, and their respective Affiliates may exercise all contractual and legal rights and remedies which may exist from time to time with respect to such other existing and future relationships without any duty to account therefor to such Purchaser.

(d)  No Duty to Investigate Events of Default. Neither the Purchasers, any member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent nor any Debt Agreement Agent, shall have any duty or obligation to any Purchaser to ascertain or inquire or inform it as to the occurrence of any Event of Default (as defined in the Terms and Conditions) or any event or condition which, with the giving of notice or the lapse of time or both, or upon a determination, would constitute an Event of Default (as defined in the Terms and Conditions) and each Purchaser, each member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent and each Debt Agreement Agent and their respective Affiliates may communicate in writing or orally with Argentina, any other party to this Agreement or any other Person about the occurrence of any such Event of Default, event or condition or about any other matter whatsoever arising in the administration, coordination and performance of this Agreement or any other Principal Bond Agreement, all without communicating with any Purchaser about any such matter. Each Purchaser may in its discretion, but without any obligation to any other Purchaser, any member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent or any Debt Agreement Agent, notify the Closing Agent of the occurrence of any such Event of Default, event or condition. However, in no event shall any Purchaser, any member of the Working Committee for Argentina, the Closing Agent, the Promissory Note Agent or any Debt Agreement Agent or any of their respective Affiliates be under any duty to notify any Purchaser or the Closing Agent about any such Event of Default, any event or condition which could become such an Event of Default or any other default under any other agreement relating to any credit relationship referred to in Section 4.02(c) above or about any matter relating to any such agreement.

70

(e) Receipt of Information. Such Purchaser acknowledges receipt of copies of (i) the 1992 Financing Plan including communications from the Minister of Economy and Public Works and Services, the Managing Director of the IMF, the President of the IBRD, the President of the IADB and the Working Committee for Argentina, and the supplemental communication from the Minister of Economy and Public Works and Services dated November 10, 1992; and (ii) the information statement entitled "Republic of Argentina -- Economic Presentation -- June 1992".

(f) Waivers and Amendments. Such Purchaser has granted its Waiver and by executing this Agreement hereby reaffirms its Waiver. Such Purchaser has also executed and delivered to Argentina each of the Amendments to which it is a party.

(g) Cancellation, Obligor Consent and BCRA Undertaking.

(i) Such Purchaser irrevocably authorizes and instructs the Closing Agent to notify the Promissory Note Agent and the Debt Agreement Agents under each Debt Agreement evidencing its Reconciled ED of (x) the Exchange Date and the Escrow Release Date (as provided in Section 2.05(a) hereof) and (y) that, effective on the Exchange Date, the Escrow Release Date and each date on which Principal Bonds are released to a Purchaser in connection with an interpleader or otherwise, as the case may be, the Eligible Debt to which its Reconciled ED relates which is exchanged on such date shall be cancelled and shall cease to exist, in accordance with Section 2.02(a); provided, however, that with respect to Eligible Debt evidenced by a Promissory Note, such Eligible Debt shall be cancelled on the records of the Promissory Note Agent only and such cancellation shall not be evidenced on the Promissory Notes, and the Promissory Note shall not be destroyed, until such time as the conditions to the destruction and cancellation of Promissory Notes specified in Section 2.05(h) hereof are satisfied.

(ii) Such Purchaser, the Promissory Note Agent and each Debt Agreement Agent, authorizes and instructs Citibank, N.A., in its capacity as Closing Agent, to accept the Obligor Consent on behalf of such Purchaser, the Promissory Note Agent or Debt Agreement Agent.

71

(iii) Such Purchaser authorizes and instructs Citibank, N.A., in its capacity as Closing Agent, to accept the BCRA Undertaking on behalf of such Purchaser.

(h) <u>Ownership of Eligible Debt</u>. Such Purchaser (i) agrees that it will not transfer its Eligible Debt other than in accordance with Section 6.10(c) hereof, (ii) represents and warrants that it owns, to the best of such Purchaser's knowledge, the Unreconciled ED set forth opposite such Purchaser's name on Schedule A hereto or otherwise confirmed pursuant to Section 2.05(b) hereof and will, on the Exchange Date, the Escrow Release Date or the date on which Principal Bonds in respect of such Purchaser's Unreconciled ED are released to such Purchaser in connection with an interpleader or otherwise, own all Reconciled ED exchanged by such Purchaser for Principal Bonds hereunder, (iii) represents and warrants that on the Exchange Date and the Escrow Release Date, as the case may be, or upon the release to such Purchaser of Principal Bonds in connection with an interpleader or otherwise, its Reconciled ED will be transferred and assigned free and clear of any liens, security interests, claims, encumbrances or other charges and (iv) represents and warrants that (A) other than as disclosed to the Closing Agent, it does not, and on the Exchange Date and the Escrow Release Date, as the case may be, or upon the release to such Purchaser of Principal Bonds in connection with an interpleader or otherwise, will not, hold any Eligible Debt for or on behalf of any Argentine Bank or Argentine Governmental Entity and (B) no item of Reconciled ED listed on Schedule A hereto for such Purchaser, or any portion of any such item, is held, or on the Exchange Date and the Escrow Release Date, as the case may be, or upon the release to such Purchaser of Principal Bonds in connection with an interpleader or otherwise, will be held, for or on behalf of any Argentine Bank or Argentine Governmental Entity.

(i) <u>Power and Authority</u>. Such Purchaser represents and warrants that it has full power and authority (i) to execute and deliver this Agreement and each Amendment to which it is a party, to cancel any Eligible Debt submitted by such Purchaser for exchange hereunder and, with respect to the Waiver, has full power and authority to grant such Waiver, (ii) to incur the obligations to be incurred by it hereunder and thereunder, and (iii) to

72

perform and observe the provisions hereof and thereof on its part to be performed or observed.  The execution, delivery and performance by it of this Agreement and the Amendments and the granting of the Waiver have been duly authorized by all necessary action on its part.

(j) **Private Placement**.  To the extent that such Purchaser is indicated on Schedule A hereto to be (x) a U.S. Person or (y) a Non-U.S. Person electing to receive Principal Bonds pursuant to Section 4(2) of the Securities Act, such Purchaser:

(i)  represents that it is an institution that is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act and (A) will acquire the Principal Bonds it acquires thereunder for its own account or for the account of (1) another Purchaser that is listed on the signature pages hereof, (2) a Qualifying QIB, (3) a Qualifying Non-U.S. Person or (4) with respect to the sale of a participation in Eligible Debt prior to the signing of this Agreement, an institution that is an "accredited investor" within the meaning of Regulation D of the Securities Act and (B) is not acquiring the Principal Bonds with a view to any distribution thereof within the meaning of the Securities Act;

(ii)  agrees that it will not offer or sell the Principal Bonds it acquires hereunder, directly or indirectly, other than (A) pursuant to an effective registration statement under the Securities Act or (B) in compliance with the transfer restrictions referred to in Section 6 of the Fiscal Agency Agreement;

(iii)  acknowledges that the Principal Bonds have not been and will not be registered under the Securities Act;

(iv)  acknowledges that the Principal Bonds issued to it will contain the Securities Act Legend until the Fiscal Agency Agreement permits the Securities Act Legend to be removed;

(v)  represents that it has not prior to July 3, 1992 offered or sold any Principal Bonds, Option or Eligible Debt except for offers or sales which did not require registration under the Securities Act;

(vi)  represents that it has not, during the period from July 3, 1992 until the date on which it executes this Agreement, offered or sold (A) any Principal Bond or Option except for offers or sales, (1) to a Qualifying QIB in the United States in Minimum Amounts without using any General Solicitation Methods or (2) to a Qualifying Non-U.S. Person outside the United States or to a Qualifying U.S. Fiduciary or (B) any Eligible Debt except for offers and sales which did not require registration under the Securities Act; and

(vii)  agrees that, from the date of its execution of this Agreement through the date on which any Principal Bond will be issued or released to such Purchaser, it will not offer or sell such Principal Bond or any Option or Eligible Debt related thereto except for offers and sales (A) without using any General Solicitation Methods, to Purchasers who are listed on the signature pages of this Agreement, (B) to a Qualifying QIB in the United States in Minimum Amounts without using any General Solicitation Methods or (C) to a Qualifying Non-U.S. Person outside the United States or to a Qualifying U.S. Fiduciary.

(k)  Non-U.S. Offering.  To the extent that such Purchaser is indicated on Schedule A hereto to be a Non-U.S. Person who has not elected to receive Principal Bonds pursuant to Section 4(2) of the Securities Act (or has been named the Purchasing Office for Principal Bonds of a Purchaser which is a Non-U.S. Person in liquidation), such Purchaser:

(i)  represents that (A) it is not a U.S. Person and is not acquiring any Principal Bonds hereunder (1) on behalf of a U.S. Person or (2) with a view to the distribution in the United States or (except as may be permitted by Rule 904 of Regulation S) to U.S. Persons and (B) it received the 1992 Financing Plan from Argentina outside the United States and sent its Commitment Telex from a location outside the United States;

(ii)  represents that it is signing this Agreement (A) on its own behalf outside the United States, (B) through an attorney-in-fact pursuant to a power of attorney executed and sent from outside the United States or (C) on behalf of a Non-U.S.

74

Person pursuant to a power of attorney executed and
sent from outside the United States;

(iii)  represents that it has acquired the
Principal Bonds hereunder in an "offshore
transaction" within the meaning of Regulation S;

(iv)  acknowledges that the Principal Bonds have
not been and will not be registered under the
Securities Act;

(v)  agrees that it will not offer or sell,
directly or indirectly, any Principal Bonds in the
United States or to any U.S. Person (A) for a period
of 40 days following the Exchange Date (other than
in a transaction pursuant to Rule 904 of
Regulation S) and (B) thereafter only pursuant to an
effective registration statement, or in a
transaction not requiring registration, under the
Securities Act;

(vi)  represents that it has not prior to
July 3, 1992 offered or sold any Principal Bond, or
any Option or Eligible Debt related thereto, except
for offers or sales which did not require
registration under the Securities Act;

(vii)  represents that during the period from
July 3, 1992 until the date on which it executes
this Agreement, it has not offered or sold (A) any
Principal Bond or Option related thereto except for
offers or sales (1) to a Qualifying Non-U.S. Person
outside the United States or to a Qualified U.S.
Fiduciary or (2) with respect to U.S. When-Issued
Principal Bonds or Options only, to a Qualified QIB
in the United States in Minimum Amounts without
using any General Solicitation Methods or (B) any
Eligible Debt except for offers or sales which did
not require registration under the Securities Act;
and

(viii)  agrees that, from the date of its
execution of this Agreement through the date on
which any Principal Bonds will be issued or released
to such Purchaser, it will not offer or sell such
Principal Bond or any Option or Eligible Debt
related thereto except for offers or sales (A) to a
Qualifying Non-U.S. Person outside the United States
or to a Qualifying U.S. Fiduciary or (B) with

respect to U.S. When-Issued Principal Bonds or
Options only, (1) without using any General
Solicitation Methods, to Purchasers who are listed
on the signature pages of this Agreement or (2) to a
Qualifying QIB in the United States in Minimum
Amounts without using General Solicitation Methods.

(1) Confirmation. In connection with any
"when-issued" sale pursuant to clause (B) or (C) of
Section 4.02(j)(vii) or clause (A) or (B)(2) of
Section 4.02(k)(viii), such Purchaser agrees to obtain a
certificate executed by the buyer substantially in the
form set forth on Schedule D, provided that such
certificate shall not be required if the buyer is a
member of the Emerging Markets Traders Association and
the Purchaser gives written notice to such buyer that the
sale is subject to the resale restrictions set forth in
Schedule D. Such Purchaser further agrees that, from
time to time during the period specified in
Sections 4.02(j)(vii) and 4.02(k)(viii), upon reasonable
request from Argentina, it will confirm to Argentina that
it has complied with this Section 4.02(1).

(m) Compliance with Applicable Law. Such Purchaser
agrees that it will not offer or sell any Principal
Bonds, directly or indirectly, in any jurisdiction except
in compliance with the applicable law thereof.

(n) Privatizations. Such Purchaser represents,
warrants and agrees that (i) it has listed on its
Supplemental Schedule entitled "Eligible Debt Submitted
for Privatization" all Eligible Debt that has been or
will be submitted by such Purchaser to Argentina or any
other Argentine Governmental Agency for cancellation in
connection with a privatization or other debt conversion
program, (ii) it will promptly notify the Closing Agent
of any additional Eligible Debt that has been or will be
submitted by such Purchaser to Argentina or any Argentine
Governmental Agency for cancellation in connection with a
privatization or other debt conversion program, and
(iii) none of such Purchaser's Reconciled ED or
Unreconciled ED included on Schedule A hereto has been
submitted or is contemplated to be submitted to Argentina
or any other Argentine Governmental Agency in connection
with any privatization or other debt conversion program
awarded prior to the Exchange Date in which such
Purchaser, or the Person on whose behalf such Purchaser
is holding Eligible Debt, is or will be an investor.

76

(o)  **Principal Bonds Denominated in Deutsche Mark
Offering**.  Each Purchaser of Principal Bonds denominated
in Deutsche Mark represents and certifies that (i) it is
not a "United States person" within the meaning of
Section 7701(a)(30) of the Code or (ii) if it is a
"United States person" within the meaning of said section
7701(a)(30), it is a "foreign branch of a United States
financial institution" within the meaning of United States
Treasury Regulation Section 1.163-5(c)(2)(i)(D)(6)(i)
that agrees to comply with the requirements of Section
165(j)(3)(A), (B) or (C) of the Code.  In addition, each
such Purchaser that is a United States or foreign
"financial institution" (within the meaning of United
States Treasury Regulation Section 1.165-12(c)(1)(v)),
hereby represents and certifies that if it is receiving
DMK Bonds for purposes of resale during the restricted
period (as defined in U.S. Treasury Regulations
Section 1.163-5(c)(2)(i)(D)(7)), it hereby represents
that it has not acquired such DMK Bonds for purposes of
resale directly or indirectly to a "United States person"
(within the meaning of Section 7701(a)(30) of the Code)
or to a person within the United States or its
possessions.  Each Purchaser of Principal Bonds
denominated in Deutsche Mark hereby undertakes to notify
Argentina promptly if the representations in this
Section 4.02(o) are untrue with respect to any Principal
Bond on any date after the date hereof until the Exchange
Date, the Escrow Release Date, or any later date that
such Principal Bond is released to such Purchaser in
connection with an interpleader or otherwise as the case
may be, relating to such Principal Bonds.

SECTION 4.03.  **Confirmation of Representations,
Warranties and Agreements of Purchasers**.  Each Purchaser, by
its acceptance of any Principal Bonds issued or released to
such Purchaser on the Exchange Date, the Escrow Release Date
or thereafter, shall confirm to each other Purchaser, each
member of the Working Committee for Argentina, the Closing
Agent, each relevant Debt Agreement Agent and Argentina, as
applicable, that the representations, warranties and
agreements of such Purchaser contained in Section 4.02 hereof
are true and correct on the Exchange Date, the Escrow Release
Date or such other date, as the case may be.

77

## ARTICLE V

### DUTIES, OBLIGATIONS AND IMMUNITIES
### OF CERTAIN PARTIES

SECTION 5.01.  Limited Appointment and
Responsibilities of the Closing Agent.  (a)  The Closing
Agent shall perform the mechanical and clerical functions in
connection with the administration of this Agreement which
are specifically set forth herein for the Closing Agent.  In
connection therewith, the Closing Agent shall have such
powers as are reasonably incidental thereto.  The
responsibilities of the Closing Agent are strictly limited to
those specifically set forth in this Agreement, and no
unstated functions, responsibilities, duties, obligations or
liabilities shall be read into this Agreement or otherwise
exist against the Closing Agent.  Neither the Closing Agent
nor any member of the Working Committee for Argentina shall
be deemed an agent, trustee or fiduciary hereunder for
Argentina, any Argentine Governmental Entity, any Purchaser
or any other Person, except as otherwise expressly provided
in this Agreement.

(b)  Argentina agrees to pay to the Closing Agent
fees and transaction operating costs as provided in a letter
dated June 2, 1992 from the Closing Agent to Argentina and
signed by Argentina.

SECTION 5.02.  Discretion and Protection of the
Closing Agent.  (a)  No Duty to Exercise Discretion;
Consultations.  As to any matters not expressly set forth in
this Agreement as a function or responsibility or
discretionary power of the Closing Agent, the Closing Agent
shall not be required to exercise any discretion or take any
action, except that the Closing Agent may, in its sole
discretion, act or refrain from acting (and shall be fully
protected in so acting or refraining from acting) upon the
instructions of the Requisite Purchasers (as defined below),
and such instructions shall be binding upon the Closing Agent
and all Purchasers.  If, with respect to a proposed action to
be taken by it, the Closing Agent shall determine in good
faith that the provisions of this Agreement relating to the
functions or responsibilities or discretionary powers of the
Closing Agent (i) are or may be ambiguous or inconsistent or
(ii) do not set forth such action as a function or
responsibility of the Closing Agent, the Closing Agent may so
notify the appropriate parties hereto (identifying the
proposed action and the provisions that it considers are or
may be ambiguous or inconsistent or not a function or

78

responsibility of the Closing Agent) and may decline either
to perform such function or responsibility or to exercise
such discretionary power unless it has received the written
confirmation of the Requisite Purchasers that the Requisite
Purchasers concur in the circumstances that the action
proposed to be taken by the Closing Agent is consistent with
the terms of this Agreement or is otherwise appropriate. The
Closing Agent shall be fully protected in acting or
refraining from acting upon the confirmation of the Requisite
Purchasers in this respect, and such confirmation shall be
binding upon the Closing Agent and the Purchasers. For the
purposes of this Section, the term "Requisite Purchasers"
shall mean:

    (i) in respect of matters affecting all Purchasers,
the Majority Purchasers; and

    (ii) in respect of matters affecting only a class of
Purchasers (as defined by Principal Bond Currency, Series
of Principal Bonds or other comparable criteria),
Purchasers of such class having more than 50% of the U.S.
Dollar equivalent (as determined in accordance with
Section 6.14 hereof) of the Reconciled ED of the
Purchasers of such class at the time of determination.

    This Section 5.02(a) is for the protection of the
Closing Agent, but the Closing Agent shall not be required to
obtain any such written confirmation of the Requisite
Purchasers in order to perform any function or responsibility
or to exercise any discretionary power of the Closing Agent
set forth in this Agreement. Nothing in this Section 5.02(a)
shall be construed to permit any additional obligation to be
imposed upon any Purchaser or Argentina or to alter the
requirements of Section 6.01 hereof with respect to
amendments or waivers to this Agreement.

    (b) No Requirement to Take Certain Actions. The
Closing Agent shall not in any event be required to take any
action which in the judgment of the Closing Agent (i) is
contrary to this Agreement or applicable law or (ii) exposes
any of the directors, officers, attorneys, agents or
employees of the Closing Agent to personal liability.

    (c) Exercise of Discretion Not an Undertaking to Do
So Again. If in one or more instances the Closing Agent
takes any action or assumes any responsibility not
specifically delegated to it pursuant to the provisions of
this Agreement, neither the taking of such action nor the
assumption of such responsibility shall be deemed to be an

79

express or implied undertaking on the part of the Closing
Agent that it will take the same or similar action or assume
the same or similar responsibility in any other instance.

(d) <u>Reliance on Documents</u>. The Closing Agent may
rely on information received from Argentina, BCRA, any
Obligor, any other party to this Agreement or any member of
the international banking community pursuant to this
Agreement. The Closing Agent shall (i) have no
responsibility to review or verify the accuracy or
completeness of any information contained in any notice or
certificate or other communication (including any such
communication by cable, telegram, telecopy, telex or
telephone) received by the Closing Agent from any Person
pursuant to or as contemplated by the Agreement or otherwise,
or (ii) incur no liability under or in respect of this
Agreement by acting upon any such communication believed by
it to be genuine and correct and to have been signed, sent or
given by or on behalf of the proper party or parties, or by
acting in reliance upon any representation, warranty or
statement of Argentina, BCRA or any other Person made in this
Agreement or in any document delivered pursuant hereto. To
the extent that the Closing Agent is required by any
provision of this Agreement to take any action or prepare any
report in reliance upon any information, report, document or
other communication to be furnished by any other Person, the
failure of any such other Person to furnish such information,
report, document or other communication shall excuse the
Closing Agent from taking such action or preparing such
required report; <u>provided</u> that the Closing Agent may in its
discretion (but only to the extent not inconsistent with the
other provisions hereof) partially take such required action
or partially prepare such required report on the basis of the
information, reports or documents furnished to it by other
Persons.

(e) <u>Reliance on Counsel</u>. The Closing Agent may
consult with legal counsel (including counsel to Argentina),
independent public accountants and other professional experts
and consultants selected by it and shall not be liable for
any action taken or omitted to be taken in good faith by it
in accordance with the advice of such counsel, accountants,
experts or consultants.

(f) <u>No Duty to Inquire</u>. The Closing Agent shall
have no duty to ascertain or to inquire as to the performance
or observance of any of the terms, covenants or conditions of
(A) this Agreement or any other Principal Bond Agreement on
the part of Argentina, the Purchasers, the Collateral Agent

or any of the agents, sub-agents or sub-custodians of any such Person or (B) the BCRA Undertaking on the part of BCRA.

(g) No Responsibility for Validity or Effect of Documents. The Closing Agent shall not be responsible to any Purchaser for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Principal Bond Agreement or any other instrument or document furnished pursuant hereto or thereto or the BCRA Undertaking.

(h) No Duty to Initiate Suits. Except as expressly contemplated by Section 3.05 hereof, the Closing Agent shall not be required to initiate any suit, action or proceeding (arbitral or otherwise) arising out of or in connection with this Agreement or any other Principal Bond Agreement or the BCRA Undertaking.

(i) Computation of Percentage of Purchasers. Prior to being required to take any action at the request, with the consent or upon the instruction of Requisite Purchasers, the Closing Agent shall be entitled to have confirmed to it by the Purchasers the aggregate principal amount of the Reconciled ED and Unreconciled ED held by each Purchaser and in any such event may rely conclusively upon such confirmation.

SECTION 5.03. Limited Liability of the Closing Agent, the Escrow Agent, the Debt Agreement Agents, the Promissory Note Agent and the Working Committee for Argentina. (a) Limited Liability. (i) The Closing Agent, the Debt Agreement Agents and the Promissory Note Agent. None of the Closing Agent, the Escrow Agent, the Debt Agreement Agents, the Promissory Note Agent or any of their respective directors, officers, agents or employees shall be liable to any Person for any action taken or omitted to be taken by it or them under this Agreement or otherwise in connection with this Agreement (including without limitation any action taken or omitted to be taken before the date hereof by the Closing Agent, the Escrow Agent, any Debt Agreement Agent or the Promissory Note Agent in preparation for acting hereunder) except for its or their own gross negligence or willful misconduct. The Closing Agent, the Escrow Agent, any Debt Agreement Agent or the Promissory Note Agent may employ agents and attorneys-in-fact and shall not be liable for the default, negligence or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care. Each Purchaser agrees that the limitation on liability contained in this Section 5.03(a) is for the benefit and protection of