22        MR. GLEIZER: But I tell you how to look. The

23    bankruptcy was in place from two years before the rescission.

24    On those two years or one year, they were trying to make deals.

25    What happened was in November 16, 2003, I believe, the judge

54

1    said, OK, full bankruptcy, you have no assets. Excuse me.

2    December 16, 2003, no assets. They used an old Spanish word

3    which Black's Law Dictionary defines as the full estate, that

4    is the assets. The full estate it says, Black's Law

5    Dictionary.

6        THE COURT: The full estate what?

7        MR. GLEIZER: Of Correo's, there is no more. It has

8    no estate. Correo has nothing, no tangible assets and no

9    intangible assets. That is on December 16, I believe.

10        THE COURT: Where does he say that?

11        MR. GLEIZER: In his declaration, in one of his orders

12    of December 16.

13        THE COURT: Is that before me? Is that part of the

14    record here?

15        MR. GLEIZER: It is, your Honor. One of the places,

16    for example, is Exhibit J.

17        THE COURT: Exhibit J. Where does it say --

18        MR. GLEIZER: In paragraph 2, the translation for the

19    attorney for the trustee says, currently, the entity in

20    concorso, that is the word he uses for this stage of the

21 bankruptcy proceeding, lacks "hacienda." And the judge tells

22 us what "hacienda" means.

23     MR. BLACKMAN: Your Honor, could he please read the

24 rest that have sentence?

25     MR. GLEIZER: Let me finish, please. Lacks hacienda.
                                    55

1 That is the tangible and intangible assets organized for the

2 exploitation of the enterprise. Lacks them. It has no

3 tangible and no intangible. What other assets can there be?

4 Tangible and intangible. There is no more assets. Lacks them.

5 There is no assets in CASA since December 16, 2003.

6     It is on that basis, your Honor, that the judge tells

7 you that the only reason that these are not attachable assets

8 of Argentina -- because he says the only reason is CASA is the

9 account holder in the name. That is for sure. Otherwise,

10 there is no need to be here.

11     He says the only reason that Mr. Gleizer cannot attach

12 for his clients is that I ordered it before Judge Griesa,

13 ordered it, and Gleizer notified, that is, physically

14 restrained the goods. The only reason that Judge Favier gives,

15 your Honor, is that: That he issued the order for the freeze

16 of the assets. And this may be so.

17     My argument is that, yes, you ordered it before Judge

18 Griesa but you didn't garnish, you didn't notify the parties,

19 you didn't notify the holders of that property. The Court can

20  see that he did not notify, because CASA doesn't present any

21  evidence that there was notification actually.  Because the

22  order says that the trustee, her client, the trustee had to do

23  the notification, so that the attachment --

24        THE COURT:  Can I interrupt.  I can see the

25  possibility, we can all see the possibility, of the republic

56

1  wanting the $11 million if this is money that the republic

2  could seize or require to be transferred, if the republic would

3  like to have it to help run the postal service.  It doesn't

4  take too much imagination to realize that the republic might

5  take that money or might require the transfer of that money.  I

6  imagine under the concession agreement paragraph 26.1 the

7  republic could require that.  But the representation to this

8  Court by Mr. Rivera and what has been stated by the judge in

9  that insolvency, it seems to me that is really what Ms. Bolatti

10  is saying.

11        There may be a hidden agenda here.  Maybe there is a

12  credibility problem.  I don't know.  I don't know.  And I hope

13  the Argentine press does not quote me as saying there is a

14  credibility problem, but that is really what you are trying to

15  say.

16        So it is possible.  But it is also possible that the

17  Republic of Argentina would leave some assets in Correo.  There

18  are undoubtedly creditors of Correo.  If Correo is insolvent,

19  what the republic might very well do is to take things like

20  post offices, equipment at post offices, trucks, mailbags,

21  stamps, all of those things which are necessary to continue the

22  running of the postal service.

23      But the republic might very well decide, we are not

24  going to simply strip it to the bone of all its assets, because

25  this company has been in business, it has creditors, it has

57

1  stockholders, and we want to interpret paragraph 26.1 of the

2  concession agreement maybe a little more narrowly rather than a

3  little more broadly, and we are going to take what we feel is

4  necessary to run the postal service, and we don't need to take

5  every dollar of cash, we are going to leave some assets there

6  to be handled in the insolvency to help pay creditors, and so

7  forth.

8      That is a completely logical way to approach things,

9  and that is what the judge basically has said.  Not in those

10  words, but that is the essence of what emerges from the judge's

11  statement.  That is what Mr. Rivera has said.  That is what Ms.

12  Bolatti has said.

13      Am I characterizing your presentation correctly?

14      MS. BOLATTI:  That is correct, your Honor, yes.

15      THE COURT:  Am I going to continue to tie up the $11

16  million which is tied up on the basis of what I think is not

17  much more than a possibility that you have shown?  Tying up

18    money is a very serious thing for a court to do.

19        MS. BOLATTI:  Your Honor, may I add something?

20        MR. GLEIZER:  May I say something?

21        THE COURT:  Everybody, yes.

22        MS. BOLATTI:  Your Honor, just to go back to Exhibit

23    A, which is the exhorto or the communication of the Argentine

24    court, I just want to clarify for the Court that Judge Favier

25    Dubois says to this court such accounts are private property of

58

1    CASA, not transferred to the government, on the date of

2    November 19, 2003, the date on which he took over and regained

3    control of the official postal service.

4        On the next page, your Honor, where it speaks about

5    resolution 32, which has been quoted by Mr. Gleizer as

6    transferring all of the assets --

7        THE COURT:  Let me look at the translation.  Where are

8    you reading now?

9        MS. BOLATTI:  I am at Exhibit A to the Rivera

10    declaration, on the second page of the English.  You have to go

11    a little bit back to find the English text.

12        THE COURT:  Yes, I'm there.

13        MS. BOLATTI:  It has a little (a) on the left

14    paragraph margin.  It is all the way up by the Velobind, your

15    Honor.

16        MR. GLEIZER:  What exhibit is this now?

17    MS. BOLATTI:  We are talking about Exhibit A.

18    THE COURT:  Exhibit A, I have it.  Where in the

19    Exhibit A?

20    MS. BOLATTI:  It is in the second page of the English

21    translation.  There is a little (a) on the margin.  Judge

22    Favier Dubois says to this court, your Honor, that such

23    accounts are the private property of CASA, not transferred to

24    the government on November 10, 2003 -- I think he means

25    November 19th -- the date on which it took over and regained

59

1    control of the official postal service.  It is accurate, your

2    Honor, that the only thing the government took back were the

3    physical assets to run the service.

4    THE COURT:  You referred to some decree, 32 or

5    something?

6    MS. BOLATTI:  That is on the next page, your Honor.  I

7    am saying that if you turn to --

8    THE COURT:  Resolution number 32.

9    MS. BOLATTI:  That's right.  I think Mr. Gleizer had

10   cited that at the February 17th hearing as evidence that all of

11   the assets were transferred to the government.  That is

12   absolutely not so.  In fact, the judge says, resolution number

13   2 of the Argentine communications department was issued

14   recently, on February 12, 2004.  This resolution acknowledges

15   the investments made by former concessionaire, the former

16  concessionaire of the post office service Correo Argentino.

17      "Under the terms of paragraph 6.4 of the concession

18  contract, in respect to the period from December 1, 1998, to

19  November 19, 2003, the concession contract was terminated and

20  the property incorporated into government domain was

21  identified: Software, hardware, office supplies, land,

22  building, and machinery. Such property does not include the

23  debtor's bank accounts."

24      One last thing, your Honor, that I would like to add,

25  which is that there is nothing in the concession agreement that

60

1  would allow the government to assert a right over these bank

2  accounts. That is the reason that the government has not

3  asserted a right over the bank accounts in its own decrees, in

4  the resolutions, or in any other document.

5      One last thing, your Honor. The court in Argentina,

6  the payments that were made from these New York accounts were

7  made strictly with the authority of the Argentine Judge Favier

8  Dubois in the insolvency proceeding. That means that Judge

9  Favier Dubois believes these accounts to be assets of the

10  estate and not of the republic.

11      MR. GLEIZER:  If I may?

12      THE COURT:  The $11 million that you mentioned, does

13  that remain after payment of the 4.5 or 4.7?  What was it?

14      MR. GLEIZER:  Yes, your Honor.

15    THE COURT:  4 point what?

16    MR. GLEIZER:  4.7.

17    THE COURT:  Ms. Bolatti, has the insolvency judge ever

18  dealt with his proceeding on the basis of there being no assets

19  of Correo?  That is one of the things that Mr. Gleizer speaks

20  of.

21    MS. BOLATTI:  It is absolutely wrong, your Honor.

22  That is not the case.  I believe that the confusion that Mr.

23  Gleizer has is his interpretation of the word "hacienda."  The

24  word "hacienda," I have a translation here if you would like,

25  your Honor, of the context in which that word is used.  It is a

61

1  word used by doctrine in Argentina.  It does not mean assets.

2       Basically, what it means is that because the

3  government rescinded the concession agreement and basically

4  took away the license to operate the post office.  It has no

5  ability, it is not an ongoing concern, and it no longer

6  provides the postal service.

7       The exact translation, your Honor, of the December 16

8  resolution of the Argentine court that uses that term says, and

9  this is an English translation attached to Dr. Rivera's

10  declaration, "As a consequence of the administrative

11  disempowerment following the rescission of the concession,

12  currently the entity in concorso lacks hacienda, that is, the

13  tangible and intangible assets organized toward the

14  exploitation of the enterprise." That doesn't mean it has no

15  assets. It means the lacks the ability to continue to provide

16  the service, your Honor.

17      MR. GLEIZER: In fact, your Honor, the judge on

18  February 11, and I have it here, translation by Dr. Rivera,

19  Exhibit O, on February 11, 2004, by Judge Favier Dubois on page

20  2 of the translation, your Honor, page 2 in I believe it is the

21  third paragraph, "Consequently" -- this is returning from the

22  Appellate Division, so the judge says -- "the letter has been

23  temporarily returned to the situation of interim bankruptcy

24  proceeding, but with the following particular conditions."

25      I go now to (c), the condition number (c) or letter

                                    62

1  (c). In English translated by Mr. Rivera it says, "It is

2  lacking a business, since all assets and personnel were

3  transferred to the national state." And of course the only

4  residual activity is accounts payable and receivable.

5      MR. BLACKMAN: Which is what we are talking about

6  here.

7      THE COURT: But he goes on -- what is this document,

8  Mr. Gleizer?

9      MR. GLEIZER: This is Judge Favier Dubois setting the

10  terms once the case came back a few weeks, three weeks ago.

11      THE COURT: It is the same judge?

12      MR. GLEIZER: Yes. Your Honor, if I may --

13    THE COURT:  Wait a minute.  He was doing what?

14    MR. GLEIZER:  The case went up on appeal.

15    THE COURT:  Correo objected to being put in

16  bankruptcy, right?

17    MR. GLEIZER:  No.  CASA went into bankruptcy two years

18  ago.

19    THE COURT:  Voluntarily?

20    MR. GLEIZER:  I don't know.

21    MR. BLACKMAN:  Your Honor, if I could help.  The

22  concorso proceeding is a Chapter 11, in effect.  That began

23  several years ago.  After the government withdrew the

24  concession, the judge said this entity can't reorganize, it is

25  not a going concern anymore, and he threw it into what we would

63

1  call Chapter 7.

2    Correo appealed and said, no, we still think we should

3  be allowed to reorganize.  The appellate court agreed and

4  reversed and it sent it back.  This is a decision actually on

5  an application by Correo to say, well, now we want to use these

6  moneys in New York.

7    What the judge says here is you still lack a business,

8  a hacienda, because you are not a going concern, and your only

9  residual activity is pending accounts, i.e., these accounts.

10  Two paragraphs down, "Indeed, the debtor possesses sufficient

11  funds in the accounts open in different banking institutions to

12   attend to its residual activity."

13          The point is this is an entity that is not doing a lot

14   but it still has assets. That is what all of these documents

15   say in different ways. That is what the bankruptcy judge says.

16   This is what Mr. Rivera says. And Mr. Gleizer just doesn't

17   want to accept reality.

18          THE COURT: My eye drifted to the lower part of the

19   page, and I saw that paragraph. You are right, there is this

20   statement "is lacking a business since all assets were

21   transferred." But it goes about two paragraphs on and says

22   exactly what Mr. Blackman reads. We can all read it. "Indeed,

23   the debtor possesses sufficient funds in the accounts open in

24   different banking institutions in this country to attend to its

25   residual activity," and so forth and so on.

64

1          MR. BLACKMAN: Maybe you could look at the next-to-

2   last paragraph.

3          THE COURT: I know you said it, but I sometimes have

4   to ask, the appeal was from what?

5          MR. BLACKMAN: The appeal was from the decision to put

6   them into bankruptcy.

7          THE COURT: And not allow them to reorganize?

8          MR. BLACKMAN: Right.

9          THE COURT: The appellate court said they have a right

10   to reorganize?

11       MR. BLACKMAN: The appellate court sent it back on

12    what we would say is a remand.

13       MS. BOLATTI: In the interim, your Honor, Correo

14    continues to be in possession of the assets. That is the

15    difference between insolvency proceedings. It continues to be

16    in possession of the assets.

17       Also on the same page, if you read lower down, it

18    says, "in addition to this," and cites that it is important to

19    preserve such an important bankruptcy asset, speaking about the

20    New York account it can possibly use but it is not in the

21    creditor's interest. I am reading right below the "indeed"

22    that you just read before, your Honor.

23       So we are in the same exhibit, reading just the next

24    paragraph down. It refers to these accounts and the fact that

25    it is appropriate to preserve them, to preserve such important

                                        65

1    bankruptcy assets from a possible use that is not in the

2    creditors' interest.

3       This is in response to Correo's application to have

4    use of the accounts in New York, and the court is saying you

5    have bank accounts also in Argentina, you should be able to use

6    the money in Argentina, and for the time being I am going to

7    preserve these funds in the New York account.

8       THE COURT: The way I interpret this document, the

9    insolvency judge has blocked the use of the New York accounts.

10    MS. BOLATTI:  That is absolutely correct, your Honor.

11    He blocked the accounts by virtue of two court orders, on

12    December 19th, and again he confirmed that on December 22nd,

13    for the benefit of the asset.  It is an asset for the benefit

14    of the asset, an asset of Correo.

15    THE COURT:  I just don't see how, Mr. Gleizer, I can

16    rely on that one phrase "it is lacking a business since all

17    assets were transferred."  That one phrase has to be taken in

18    the context of the rest of the document.

19    MR. GLEIZER:  Your Honor, that is not what I want to

20    rely on at all.  Let's do one experiment.  The court in the

21    order to show cause directed Argentina to stand up and say do

22    you claim that you own these $11 million or there is no claim,

23    you give up claims to this $11 million?  Is it like Judge

24    Favier says these are your assets but I don't think they are

25    attachable because I ordered?  There was an order, but the

66

1    judge ordered to stop the funds in Argentina, not to stop the

2    funds in New York and the funds happened to be in New York.

3    That is a different story.

4    But what Argentina is not telling this court, your

5    Honor, is that, yes, in effect they want to use this $11

6    million that belong to people, to these creditors that are

7    suing before you, and that they will claim them from Judge

8    Favier in Buenos Aires as they have already, and they have been

9   used, the 4.7 million have already been taken.

10      THE COURT:  Are you saying that you believe that the

11   Republic of Argentina has already claimed ownership of these

12   funds?

13      MR. GLEIZER:  Your Honor, if you notice on this letter

14   which was written of February 23rd that we are reading, Exhibit

15   A, if you notice who went there?  Did the administrative unit

16   go?  Did the unit created by the government go and tell the

17   judge this?  No.  He went the Attorney General of Argentina,

18   not the party in this bankruptcy, but the Attorney General.

19      THE COURT:  Where does it say the Attorney General

20   went?

21      MR. GLEIZER:  On page 1 of the translation, Roman

22   numeral II in the first page of the translation in Exhibit A.

23   Exhibit A, Roman numeral II.

24      THE COURT:  You are saying that I should draw an

25   inference from the presence of what is called the treasury

67

1   general attorney's office?

2      MR. GLEIZER:  It says, "in light of the request made

3   by the treasury general attorney."  That is the Attorney

4   General.

5      THE COURT:  It says in "the preceding brief."  I don't

6   think the preceding brief is before me, is it?

7      MR. GLEIZER:  No.  That is one of the little stories

8  that they are not telling you what is going on behind the

9  scenes, your Honor. Let Argentina stand up now and say we have

10  no interest in the funds.

11       MR. BLACKMAN: We have no interest in the funds. We

12  have never had any interest in the funds. Our brief makes that

13  quite clear that we have no interest in this account or in

14  these funds, period, full stop.

15       MS. BOLATTI: Your Honor, we contest any interest of

16  the republic in these funds. These funds are the ownership of

17  my client until a court in Argentina determines otherwise. And

18  we have contested claims of the republic. We are appealing

19  their decree.

20       THE COURT: You are appealing what decree?

21       MS. BOLATTI: The decree that rescinds the concession,

22  your Honor, is being appealed by my client. So we contest any

23  claim that the republic may have to these funds. We are

24  contesting them presently in Argentina, your Honor.

25       MR. GLEIZER: Should there be a factual issue, your

                          68

1  Honor, the account in Paribas has at least something that we

2  can trace. I mean we would need the discovery, $750,000 paid

3  by UPU. UPU is the Universal Postal Union, Universal Postal

4  Union.

5       In Annex 1 of resolution number 32 it says the

6  financial contributions of UPU are transferred from Correo

7  Argentino S.A. to the administrative unit. Of the $1.5 million

8  approximately in Paribas, and this $750,000 explicitly, this is

9  not all assets, these are the assets that are being transferred

10  now. I request that Ms. Bolatti check if it is not true that

11  it says addendum 1, the financial payments of UPU are

12  transferred to the administrative unit.

13      THE COURT:  What is the administrative unit? The

14  government?

15      MR. GLEIZER:  The government created, by the

16  rescission decree, the administrative unit to administer, and

17  it says, to administer all assets.

18      MS. BOLATTI:  Your Honor, I believe Mr. Gleizer's

19  statements are just inconsistent with the plain language of

20  this document. If you look at resolution 32, the only thing it

21  says is we need to identify which assets were purchased by the

22  concessionaire with a minimum annual investment requirement

23  made under paragraph, I believe, 6.4 of the concession

24  agreement. It lists them. It has an Annex 1 and it has an

25  Annex 2. All of the assets are physical assets.

69

1      Any UPU investments that were made are specifically

2  excluded by the government, and the government says we do not

3  recognize any assets purchased with the UPU contribution to be

4  included. If you look at Annex 1 and 2, it deducts those

5  amounts from the recognized minimum investments that revert

6  back to the estate. We are talking about physical assets, your

7  Honor.

8        I think if Mr. Gleizer reads that document completely,

9  he will agree with us.

10        MR. GLEIZER: Let's read it, your Honor. Page 2

11  says --

12        THE COURT: Of what?

13        MR. GLEIZER: Of what counsel is looking at, Exhibit

14  I.

15        THE COURT: Exhibit I?

16        MS. BOLATTI: Yes.

17        MR. GLEIZER: Page the 2.

18        THE COURT: OK.

19        MR. GLEIZER: According to the terms of point 70, 26,

20  and --

21        THE COURT: Where are you reading, please?

22        MR. GLEIZER: Two paragraphs from the bottom.

23  "According to the terms of point 70, 26, and similar of the

24  concession agreement signed between the ex-concessionaire

25  Correo Argentino S.A. and the national state, all the goods

70

1  acquired by the concessionaire and recognized as an investment

2  are to revert to the national state."

3        MS. BOLATTI: At the same page, your Honor --

4        MR. GLEIZER: Let me finish, please.

5      MS. BOLATTI:  I'm sorry.

6      MR. GLEIZER:  And one of the assets are there are

7  physical assets in Addendum 1 that were recognized as

8  investment that revert to Argentina, there are these physical

9  assets.

10      THE COURT:  Was there an Addendum 1?

11      MR. GLEIZER:  Yes, at page 4, your Honor.

12      MR. BLACKMAN:  Addendum 1 shows the UPU amount as a

13  deduction.

14      THE COURT:  I'm not following you.

15      MR. BLACKMAN:  What this decree is supposed to do is

16  to identify what assets are being taken over.

17      MR. GLEIZER:  Right.

18      THE COURT:  Taken over from Correo?

19      MR. BLACKMAN:  From Correo by the government.

20  Addendum 1 has a minus sign in front of the UPU amount.  In

21  other words, deducted from the assets that are being taken over

22  is the UPU amount.  The UPU amount is not taken over.  And the

23  details of that minus $1,039,000 are set forth in Addendum 2,

24  which says detailed own investment sums and those provided by

25  the quality service fund, a dependent entity of the Universal

71

1  Postal Union, and it adds up the CASA investment, and then it

2  adds up the UPU investment.

3      The UPU investment, if you go back to Addendum 1, is

4  in what is deducted.  You get the total of 46 million, which is

5  the investment of CASA that is being taken over.

6        This document shows exactly the opposite of what Mr.

7  Gleizer is contending.  What he does here, your Honor, with all

8  respect to him, is just to pull things out of context and cause

9  all of us to be spending a lot of time on something that really

10  is quite straightforward on the declaration of Rivera and the

11  bankruptcy judge's decree.

12        MR. GLEIZER:  In Addendum 1 they separate what is

13  recognized and not recognized.  But it says all these sums pass

14  to the national state.  Your Honor, I get very nervous when I

15  am personally attacked.  The concession at 26.1 says all

16  assets.

17        THE COURT:  I don't think there is a personal attack.

18  There are issues here.  You are raising issues, they are

19  raising issues.  What is UPU again?

20        MR. BLACKMAN:  Universal Postal Union.

21        MR. GLEIZER:  Your Honor, I am asking if your Honor

22  allows me to -- I spoke with both banks.  Of course they are

23  banks.  They don't like to give out information.  But if there

24  is a specific order saying who put the money here, you will see

25  that these are all payments pertaining to the service of postal

72

1  service.  It is all payments from Germany to Argentina, the

2  German private company to the Argentino Correo, payments from

3  UPU. That is what they are. They are all pertaining to

4  services.

5       THE COURT: Are you talking payments to Correo or

6  payments by Correo?

7       MR. GLEIZER: To Correo, because it is money that came

8  in. It is money that came in for service provided, and that is

9  exactly what --

10      THE COURT: Obviously, some money came in to make up

11  the $11.1 million. The question is who owns it now that it is

12  in and there. I thought the issue we started out with and the

13  issue we have to end with is -- I didn't think there was any

14  question about the fact that Correo owned the money.

15      MR. GLEIZER: No. Correo is the title holder.

16  Argentina owns the money. The judge says so.

17      THE COURT: Wait a minute. Did the UPU at some point

18  pay Correo something?

19      MR. GLEIZER: Sure, all the time.

20      THE COURT: What did they pay them for?

21      MR. GLEIZER: I don't know. Correo provides postal

22  services. UPU, I understand, is like an international

23  clearinghouse, and also it promotes undeveloped countries'

24  postal service.

25      THE COURT: We have to draw this to a close. The

73

1  reason I have sat here is that Argentina is a foreign country.

2  Information about what goes on in Argentina is not as easy to

3  obtain or even understand as things that would happen in the

4  United States.

5      There is a substantial amount of money which has been

6  frozen. It is quite obvious that we have bondholders who are

7  suing to recover on defaulted bonds. Some of them have won

8  summary judgment motions, they have judgments. They were

9  entitled to those judgments. They undoubtedly will have a

10  great deal of difficulty enforcing those judgments. There is

11  as of this time no overall debt workout to take care of any

12  bondholders, whether they are suing or not.

13      We have a company Correo which has some relationship

14  with the Argentine government, and Correo has bank accounts at

15  Paribas and Lehman holding 11.1 million. If that money is

16  legitimately available to satisfy what will undoubtedly be a

17  tiny, tiny fraction of the bond liability of the Argentine

18  government on judgments, then this Court does not want to see

19  that vanish. At the same time, if it is not available

20  lawfully, then this Court must not hold up that money.

21      The facts that have been presented here today, both in

22  documents and in argument, are strongly in favor of what Ms.

23  Bolatti has presented. I have to say, however, that I am not

24  completely satisfied that there isn't something else in the

25  picture that does not meet the eye.

74

1    If those funds are released and if as time goes on it

2    appears that somehow the republic gets those funds, then that

3    will be a deprivation of justice to these judgment creditors

4    and it is perfectly conceivable that that will happen. I will

5    not release those funds unless I have some security or some

6    assurance that if that happens, those funds will be returned.

7    I want the parties to consider that, and I am adjourning the

8    hearing for that to be considered. I am not granting any

9    motion today, and I will not grant any motion to have Correo

10   obtain costs. The hearing is adjourned. Thank you.

11        (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

February 24, 2004

**BY FACSIMILE**

Bruce Paulsen, Esq.
Seward & Kissel
One Battery Park Plaza
New York, New York 10004

Todd B. Marcus, Esq.
Piper Rudnick LLP
1251 Avenue of the Americas
New York, New York 10020

Jerome C. Katz, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112

Yale Glazer, Esq.
Lazare Potter Giacovas & Kranjac LLP
950 Third Avenue
New York, New York 10022

Re:    **TAG 380, LLC v. Ronson, _et al._**
       **Index No. 101396/04**

Gentlemen:

We represent TAG 380, LLC ("TAG 380").

We enclose a Stipulation regarding the proposed briefing schedule and rescheduled hearing date with respect to Plaintiff's motion for leave to reargue a Decision and Order of Justice Marcy Friedman with respect to a _Yellowstone_ injunction obtained by TAG 380 as against defendant ComMet 380, Inc. ("ComMet"). ComMet's attorney, Mr. Bruce Paulsen has consented to the terms of the Stipulation. However, the Court has advised that all parties must agree to the terms of the Stipulation, because as a result thereof, the preliminary conference scheduled for 11 a.m. on April 1, 2004 would be rescheduled for 9:30 A.M. on that same date.

Accordingly, we request that you sign the Stipulation if you have no objections to the rescheduling of the time of the April 1 preliminary conference and fax it back to me.

Thank you for your anticipated cooperation in this matter.

Very truly yours,

Joshua H. Epstein